Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/23/2021 08:10 AM CDT

CAMMY L. KORTH, APPELLANT, V.
JOEL R. KORTH, APPELLEE.

___ N.W.2d ___

Filed April 29, 2021.    No. S-20-637.

1. **Child Custody.** Questions concerning relocation and custody are initially entrusted to the discretion of the trial court.
2. **Child Custody: Appeal and Error.** Although reviewed de novo on the record, the trial court's answer to questions concerning relocation and custody will ordinarily be affirmed absent an abuse of discretion.
3. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
4. **Child Custody.** Custody cases involving parental relocation are among the most difficult and troubling for courts to decide.
5. **Constitutional Law: Parental Rights: Child Custody.** Because the parent proposing the move in a parental relocation has constitutional rights to travel between states and to migrate, resettle, find a new job, and start a new life, an award of custody is not and should not be a sentence of immobilization. Yet, a custody order should also heed both parents' constitutional rights to the care, custody, and control of their child, as well as the child's need for a stable, healthy environment.
6. **Child Custody: Appeal and Error.** To aid in settling parental relocation matters, appellate courts have devised a two-part framework that trial courts should use to evaluate whether to grant a request for removal.
7. **Child Custody: Proof.** Under the two-part framework that trial courts should use to evaluate whether to grant a request for removal to another jurisdiction, the custodial parent proposing to move the child must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her after the proposed move. While both of these

prongs must be shown to support a removal request, the second prong is of paramount concern.

8. **Child Custody.** A custodial parent's desire to form a new family unit through remarriage is a legitimate reason for removing his or her child to another jurisdiction.

9. **Child Custody: Visitation.** To determine whether removal to another jurisdiction is in the child's best interests, a trial court should consider (1) each parent's motive for seeking or opposing the move, (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent, and (3) the impact such a move will have on contact between the child and noncustodial parent when viewed in the light of reasonable visitation.

10. **Child Custody: Proof.** It is the moving party's burden to show, by a combination of a trial court's considerations, that removal would be in the child's best interests.

11. **Evidence: Appeal and Error.** When the evidence concerning a trial court's considerations is in conflict, an appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts over another.

12. **Child Custody: Appeal and Error.** Although the relocating parent's motive is already examined during the threshold prong in a removal analysis, an appellate court recognizes the wisdom of also weighing the parents' motives in the second prong insofar as they relate to the child's best interests. At this stage of analysis, both parents' motives are assessed to determine if one is more compelling than the other.

13. **Child Custody.** The ultimate question in a removal analysis is whether one parent's aim in supporting or opposing the proposed removal is to frustrate or manipulate the other parent.

14. ____. There are nine components that may be involved in a trial court's consideration as to whether removal to another jurisdiction would enhance the quality of life of the child and custodial parent: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent, because the best interests of the child are interwoven with the well-being of the custodial parent.

15. ____. A child's intelligently stated preference regarding custody is only one consideration among many in a determination of the child's best interests.

16. ____. The final consideration in assessing the best interests of the child is what impact removal to another jurisdiction would have on the contact between the child and the noncustodial parent.

17. **Child Custody: Visitation.** While every move will have some impact, the impact of removal to another jurisdiction is chiefly concerned with the ability of the parent opposing the move to maintain a meaningful parent-child relationship after the move. Such assessment must be undertaken in the light of the potential to establish and maintain a reasonable visitation schedule, meaning one that provides a satisfactory basis for preserving and fostering a child's relationship with the nonmoving parent.

18. ____: ____. Indications of the custodial parent's willingness to comply with a modified visitation schedule also have a place in a removal analysis.

19. **Child Custody.** Any move away from a parent is likely to hinder that parent's relationship with the child.

20. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

21. **Child Custody.** Physical custody over a minor child will not ordinarily be modified absent a material change in circumstances, which shows either that the custodial parent is unfit or that the best interests of the child require such action.

22. **Modification of Decree: Child Custody: Proof.** It is the burden of the party seeking modification to show two elements by a preponderance of the evidence: First, that since entry of the most recent custody order, a material change in circumstances has occurred that affects the child's best interests, and second, that it would be in the child's best interests to change custody.

23. **Modification of Decree: Words and Phrases.** A material change in circumstances is an occurrence that, if it had been known at the time the most recent custody order was entered, would have persuaded the court to decree differently.

24. **Modification of Decree: Child Custody.** Before custody is modified, it should be apparent that any material change in circumstances alleged will be permanent or continuous, not merely transitory or temporary.

25. ____: ____. Removal of a child from the state, without more, does not amount to a change of circumstances warranting a change of custody. Nevertheless, such a move, when considered in conjunction with

other evidence, may result in a change of circumstances that warrants a modification.

26. **Child Custody.** Physical custody involves the exercise of day-to-day decisionmaking and continuous supervision over a child for significant periods of time.

27. \_\_\_\_. Depending on the child's age and needs, physical custody may include providing suitable shelter, clothing, food, toys, and emotional care.

28. \_\_\_\_. While the child's best interests is also a consideration in a removal analysis, the relevant consideration in that context is limited to whether remaining with the custodial parent after removal to another jurisdiction would be in the child's best interests.

29. \_\_\_\_. A relevant consideration in a relocation is whether changing custody to the noncustodial parent would be in the child's best interests.

30. \_\_\_\_. Determining whether a change in custody is in the child's best interests requires consideration of various mandatory and permissive factors.

31. **Modification of Decree: Child Custody: Visitation.** Relevant considerations that may also be considered in a change in custody include the stability of the child's existing routine, minimization of contact and conflict between the parents, and the general nature and health of the child. No one factor is dispositive, and various factors may weigh more or less heavily, depending on the facts of the case. The one constant is that the child's best interests are always the standard by which any custody or parenting time decision is made.

Appeal from the District Court for Buffalo County: John H. Marsh, Judge. Affirmed.

Loralea L. Frank and Nathan P. Husak, of Bruner, Frank & Schumacher, L.L.C., for appellant.

Nicole J. Luhm and Elizabeth J. Klingelhoefer, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Heavican, C.J.

## I. INTRODUCTION

This appeal concerns the "where" and "with whom" of three siblings' living situation. C.K., T.K., and I.K. were born

while their parents, Cammy L. Korth and Joel R. Korth, were married. The couple then divorced, and Cammy was awarded sole physical custody over the children, subject to parenting time with Joel. Cammy and Joel agreed to live within 20 minutes of each other near Kearney, Nebraska.

When Cammy remarried, she requested to move the children with her out of state to live with her new husband. But after a trial, the trial court found that such a move, although proposed for a legitimate reason, was not in the children's best interests. The court thus denied Cammy's removal request and instead awarded sole physical custody over the children to Joel, subject to parenting time with Cammy.

Because the trial court did not abuse its discretion in denying removal and modifying custody, we affirm.

## II. BACKGROUND

### 1. Divorce

Cammy and Joel married in 2001. Between 2005 and 2013, Cammy gave birth to three children: C.K., T.K., and I.K. The family lived together in Kearney until October 2018, when Cammy filed a complaint for dissolution of the marriage. Joel entered a voluntary appearance in the dissolution action, and in early 2019, Cammy and Joel agreed to terms for their divorce.

Accepting those terms, on April 3, 2019, the district court adopted a parenting plan to provide for the children's care and custody. Cammy and Joel were awarded joint legal custody over the children, and Cammy was awarded sole physical custody, subject to parenting time with Joel every other weekend, during summers, and on rotating holidays. Both parents were allowed "liberal telephone contact with the minor children during reasonable hours" and were encouraged to provide "a maximum opportunity" for each other to attend the children's events.

In the parenting plan, Cammy and Joel agreed their "[c]hildren shall attend Amherst Public Schools from Kindergarten

through 12th grade [and] unless [Cammy] and [Joel] agree to a change, the parents will live within 20 minutes of one another and [of] Amherst Public Schools." Another provision in the parenting plan reiterated, "[Cammy] and [Joel] will live within 20 minutes of each other to assist in all aspects of co-parenting, children's activities and involvement."

## 2. Request to Modify

Cammy remarried on February 14, 2020. On February 24, she filed a complaint in the district court for Buffalo County to modify the parenting plan. Cammy sought leave to move the children with her to Westfield, Indiana, a city in the Indianapolis, Indiana, metropolitan area where she planned to live with her new husband.

Cammy claimed that the move would be in the children's best interests because it would improve their housing and living situation, allow them greater opportunities, and enhance her own "income or employment." She claimed that her remarriage and intent to relocate constituted a material change in circumstances that warranted a change in the parenting plan. She denied that her request to move was an attempt to frustrate Joel's parenting time or to prevent him from participating meaningfully in the children's lives.

Joel filed an answer in which he contested Cammy's basis for moving the children out of state and raised an affirmative defense to Cammy's proposed modified parenting plan. He alleged there had been no material change in circumstances because "[Cammy had] already [been] in communications with her now husband at the time the [dissolution] [d]ecree was entered . . . and that during the entirety of those communications and ensuing relationship [her now] husband resided in the State of Indiana."

## 3. Trial

Cammy testified at trial about the advantages she and the children would enjoy while living in Westfield. Cammy claimed that because she would be able to live in her husband's

house and rely on his income, she would reduce her workload and thus have more time at home with the children. She claimed that her husband's house, although still being remodeled, would soon have ample space for her children and, during his parenting time, for her husband's two daughters. Cammy emphasized that she desired for the children to be raised in "a two-parent household," but that she was "not trying to replace [Joel]" in their lives.

As compared to Kearney, Cammy testified that Westfield would allow the children to attend larger, higher-ranked schools with more class offerings and activities. For example, C.K., who played on a regional ice hockey team in Kearney, would be eligible to play in Westfield High School's highly competitive hockey program. T.K., another hockey player, and I.K., a dancer and gymnast, could also continue their activities at private clubs in Westfield. To show the children's breadth of opportunities after moving, Cammy offered into evidence the Westfield High School activity book which, she noted, "was over 15 pages long." Asked whether the children would have to give up any activities by moving, Cammy replied, "I can't think of any."

Cammy denied that she would ever stop Joel from having parenting time with the children, particularly if he traveled the 750 miles from his home near Kearney to Westfield. Cammy acknowledged that Joel "has a very loving relationship" with the children, "loves and cares for those children," and "is a good dad." She also acknowledged that she would move to Westfield even if her children were not allowed to move with her.

The oldest child, C.K., who was 14 years old at the time of trial, testified in support of the move. Speaking in camera with only the court, he expressed optimism that the move would allow him to play in a more competitive hockey program, to attend a larger school with more class offerings, and to live near many college options as he proceeded through high school. When pressed, C.K. acknowledged that

his knowledge about how his life might look in Westfield derived "only [from] what my mom's told me, really." Still, the record indicates he stated an intelligent preference, supported by sound reasoning.

Cammy next called her husband to testify. He described the healthy relationships he had attempted to foster with the children. He also claimed that his job in Westfield was nontransferable and that it therefore made more financial sense for Cammy to move to where he lived rather than for him to move closer to where she lived.

Joel testified that throughout the children's lives he had been "daily" present and involved in their activities. When, from an early age, C.K. and T.K. expressed interest in ice hockey, Joel learned to ice skate and began coaching their teams. He also coached I.K.'s softball team, taught the children's 4-H classes, and served as a councilman for the church in which the children were being catechized. Joel claimed that whereas he had only ever missed two of the children's activities, including those occurring on days outside of his parenting time, "Cammy ha[d] missed quite a few," especially since she had begun traveling frequently to visit her now husband in Indiana.

Although Joel acknowledged that Westfield is in a more urban setting than Kearney, he cited the benefits to the children in remaining near Kearney. He and Cammy had chosen to raise the children there. Indeed, they had opted to send the children to Amherst Public Schools precisely for its size, despite the availability nearby of larger schools, more comparable in size to Westfield's schools. In Amherst Public Schools and around Kearney, the children had always been surrounded by supportive friends and neighbors, as well as family on both their maternal and paternal sides. By contrast, Joel noted, no biological relatives resided near Westfield.

Moving to Westfield would upend the stability in the children's lives, Joel claimed. Since Cammy had filed the request to modify, Joel had already noticed tension in their

coparenting relationship. Recently, Joel had likewise observed hostility between Cammy and her parents, who lived near Kearney. Joel expressed concern that the children's relationships with him and with the rest of their family would suffer if the children moved out of state.

Rather, Joel requested that the children remain in Kearney and live with him. He had recently been promoted to a supervisory role at his work and would thus have the flexibility necessary to ready the children every morning for school and be present for them after work and on his days off. To the extent he would need to work outside of school hours, Joel said that C.K. and neighbors could help to supervise the children.

Four witnesses also testified against removal. The witnesses generally voiced concern that uprooting the children from the Kearney community would harm the children's social and emotional well-being. One witness also conveyed her willingness to help supervise the children and transport them to and from activities if they lived with Joel and he were temporarily unavailable.

## 4. DISTRICT COURT JUDGMENT

Based on the evidence adduced at trial, the district court denied Cammy's request to remove the children to Indiana. The court's order observed that "removal cases are very difficult cases for a trial court to decide." While "[Cammy's] decision to pursue a relationship and eventually marry a person living at a distant location was a matter of her own choosing[,] [s]uch a relationship has consequences for all parties involved."

Then, despite finding that "[a] desire to reside with a new spouse is a legitimate reason for removing the minor children from the [s]tate," the district court concluded that "[Cammy] has not met her burden of proof that the move is the best interest of the minor children."

In addition, based on Cammy's acknowledgment that she planned to move to Westfield regardless of whether the children were allowed to go with her, the district court deemed

the existing parenting plan to be "obviously unworkable." The court accordingly modified it, awarding Joel sole physical custody over the children, subject to parenting time with Cammy one weekend per month, during summers, and on rotating holidays. Cammy and Joel retained joint legal custody. Joel's child support obligation was suspended.

Cammy appealed, and we moved the case to our docket.

## III. ASSIGNMENTS OF ERROR

Cammy assigns the district court erred in (1) denying her request to remove the children with her from Nebraska and (2) modifying the divorce decree to award Joel sole physical custody over the children.

## IV. STANDARD OF REVIEW

[1-3] Questions concerning relocation and custody are initially entrusted to the discretion of the trial court.[1] Although reviewed de novo on the record, the trial court's answer to such questions will ordinarily be affirmed absent an abuse of discretion.[2] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[3]

## V. ANALYSIS

### 1. Removal

[4,5] As we have observed before, custody cases involving parental relocation are among the most difficult and troubling for courts to decide.[4] Because the parent proposing the

---

[1] See *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021).

[2] See *id.*

[3] *Grothen v. Grothen*, 308 Neb. 28, 952 N.W.2d 650 (2020).

[4] See, *State on behalf of Ryley G. v. Ryan G.*, 306 Neb. 63, 943 N.W.2d 709 (2020); *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014); *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

move has constitutional rights to travel between states and to "'migrate, resettle, find a new job, and start a new life,'" an award of custody is not and should not be a sentence of immobilization.[5] Yet, a custody order should also heed both parents' constitutional rights to the care, custody, and control of their child,[6] as well as the child's need for a stable, healthy environment.

[6,7] To aid in settling these matters, we have devised a two-part framework that trial courts should use to evaluate whether to grant a request for removal.[7] Under that framework, the custodial parent proposing to move the child must first satisfy the court that he or she has a legitimate reason for leaving the state.[8] After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her after the proposed move.[9] While both of these prongs must be shown to support a removal request, the second prong is of paramount concern.[10]

### (a) Legitimate Reason

[8] Here, it is undisputed that the first prong of the above removal framework was met. We have held previously that a custodial parent's desire to form a new family unit through remarriage is a legitimate reason for removing his or her

---

[5] *Daniels v. Maldonado-Morin*, 288 Neb. 240, 243, 847 N.W.2d 79, 82 (2014) (quoting *Shapiro v. Thompson*, 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969), *overruled on other grounds, Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)). See, also, *Ryan G., supra* note 4.

[6] *Daniels, supra* note 5 (citing *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000)); *Steffy, supra* note 4. See, also, *Davis v. Moats*, 308 Neb. 757, 956 N.W.2d 682 (2021).

[7] See *Ryan G., supra* note 4.

[8] See *id.*

[9] See *id.*

[10] See, *id.*; *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

child to another jurisdiction.[11] Joel does not allege that Cammy's request to remove the children to Indiana was aimed at frustrating his parenting time.[12] Instead, as Cammy testified at trial, her aim in moving was to bring the children with her to live with her new husband.

Our removal analysis is thus limited to the second prong of the framework.

### (b) Best Interests of Child

[9] Under the second prong, we articulated in *Farnsworth v. Farnsworth*[13] three "broad considerations" that should "serve as appropriate guideposts" in a trial court's analysis. To determine whether removal to another jurisdiction is in the child's best interests, a trial court should consider (1) each parent's motive for seeking or opposing the move, (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent, and (3) the impact such a move will have on contact between the child and noncustodial parent when viewed in the light of reasonable visitation.[14]

[10,11] These three considerations are not exhaustive, nor will they be present in every case.[15] It is the moving party's burden to show, by a combination of these considerations, that removal would be in the child's best interests.[16] When the evidence concerning one of these considerations is in conflict, an appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts over another.[17]

---

[11] See, e.g., *Daniels, supra* note 5; *Demerath v. Demerath*, 233 Neb. 222, 444 N.W.2d 325 (1989); *Gerber v. Gerber*, 225 Neb. 611, 407 N.W.2d 497 (1987); *Maack v. Maack*, 223 Neb. 342, 389 N.W.2d 318 (1986).

[12] Compare *Schrag, supra* note 10. See, also, *Daniels, supra* note 5.

[13] *Farnsworth, supra* note 4, 257 Neb. at 249, 252, 597 N.W.2d at 598, 599.

[14] See, *id.* Accord *Ryan G., supra* note 4.

[15] See *Farnsworth, supra* note 4.

[16] See *Steffy, supra* note 4.

[17] *Yori v. Helms*, 307 Neb. 375, 949 N.W.2d 325 (2020).

In its order denying removal, the district court recited all three of the *Farnsworth* considerations. Its analysis, however, only explicitly considered the second, concluding that the proposed move was not likely to enhance the quality of life for the children and Cammy. Still, we find no abuse of discretion in the district court's application of that second *Farnsworth* consideration. And we find that the other two considerations also favored, or were at least neutral to, Joel's position against removal.

### (i) Each Parent's Motive

[12,13] Although the relocating parent's motive is already examined during the threshold prong in a removal analysis, we have recognized the wisdom of also weighing the parents' motives in the second prong insofar as they relate to the child's best interests.[18] At this stage of analysis, both parents' motives are assessed to determine if one is more compelling than the other.[19] The ultimate question in this assessment is whether one parent's aim in supporting or opposing the proposed removal is to frustrate or manipulate the other parent.[20]

As stated above, Cammy's motive for proposing to move the children is that she has remarried and wishes to form a new family unit with her husband in Indiana. It is understandable that Cammy would wish for the children, over whom she has exercised sole physical custody since the divorce, to join that new family unit with her.

Joel notes that in several provisions of the parenting plan, Cammy agreed to live within 20 minutes of him near Kearney and that Cammy had already been "talking" to her now husband when she stipulated to those provisions in the parenting plan.[21] However, Cammy contends that she did not at the

---

[18] See *Farnsworth, supra* note 4. See, also, *Schrag, supra* note 10.

[19] See *Farnsworth, supra* note 4.

[20] *Steffy, supra* note 4. See, e.g., *Schrag, supra* note 10.

[21] Brief for appellee at 6.

time anticipate marrying him or moving out of state to live with him. Thus, Cammy claims, contrary to Joel's suggestion, that she agreed to the parenting plan in good faith and that her motive for subsequently seeking removal was not to frustrate Joel's parenting time.

Joel's motive for opposing removal is no less compelling. He has developed close relationships with the children borne from daily interactions and parenting time with them, and he understandably worries that if they are allowed to move 750 miles away, he is unlikely to see them as often or maintain the closeness of those relationships. Joel's record of consistently exercising his parenting time and developing a positive relationship with the children indicates that he is primarily concerned with maintaining frequent and regular contact with the children.

In light of the record evidence, while Joel's motive here is perhaps slightly more compelling, the record does not indicate that either parent has come to their position in an effort to frustrate or manipulate the other. We deem this first consideration under *Farnsworth* equally balanced between the parties.

### (ii) Enhanced Quality of Life

The second consideration under *Farnsworth* is whether removal to another jurisdiction would enhance the quality of life of the child and custodial parent.[22] This was the consideration emphasized in the district court's order.

[14] As the district court found, there are nine components that may be involved in this consideration: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the

---

[22] See *Farnsworth, supra* note 4.

child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent, because the best interests of the child are interwoven with the well-being of the custodial parent.[23]

The record largely supports the district court's analysis of these components in support of its determination that moving might not enhance the quality of life for the children and Cammy. Having lived in the Kearney community for all of their lives, the children are acclimated and comfortable there. Their friends and all of their family live nearby. In contrast, apart from Cammy, the children would have no other biological family in Indiana.

In Kearney, the children play sports, are engaged in clubs, and participate in church activities. They have earned good grades. And the fact that the parents jointly selected Amherst Public Schools over other, larger schools around Kearney indicates they did not believe it was in the children's best interests to attend a larger school. Indeed, while larger schools like Westfield High School may offer more courses and activities, the children appear to be thriving in the smaller setting that Amherst Public Schools provides.

Moving to Westfield would upend the stability in the children's lives. Given its distance, such move would also inevitably limit Joel's contact with the children. Likely for this reason, Cammy's request for removal appears to have already antagonized hostilities between her and Joel.

It is true that moving to Westfield would likely enhance the income of Cammy's household. The district court found to the contrary, observing that Cammy had quit her job in Kearney in anticipation of the move and so far has been unable to find work in Westfield. Still, Cammy's new husband's

---

[23] See *id*. Accord, *Steffy, supra* note 4; *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000); *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000).

salary is nearly three times what Cammy previously was earning annually, and he owns a house, whereas Cammy was renting a duplex. Cammy's husband testified he was willing to support Cammy and the children and, unless she wished to do so, did not expect her to seek full-time employment upon moving. Therefore, even if Cammy's own employment after the move does not yield enhanced income, it appears likely that so long as she and her husband remain married, Cammy's household income will be improved by virtue of her husband's earnings.

It is also true that C.K. stated an intelligent preference, supported by sound reasoning, to move to Westfield. He wished to attend school in Westfield, play on the Westfield High School hockey team, and live near colleges he might one day wish to attend. In cases where the child's stated preference is given significant consideration, the child is typically at least 10 years old; C.K. was 14 years old at the time of trial.[24]

[15] However, as the district court rightly noted, a child's intelligently stated preference regarding custody is only one consideration among many in a determination of the child's best interests.[25] Indeed, *Farnsworth* makes explicit that the child's stated preference is typically only one of about nine components in determining whether a move will enhance the child's and moving parent's quality of life.[26] The district court therefore rightly concluded that although C.K.'s stated preference was a "factor weigh[ing] slightly in favor of the move," it did not dispositively show that removal would enhance the quality of life of the children and Cammy.

To the contrary, other components indicated to the district court that the children's and Cammy's quality of life would not be enhanced by the move. We cannot say this was an abuse of discretion.

---

[24] See *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020).

[25] See *Ryan G., supra* note 4. See, also, *Jaeger, supra* note 24.

[26] See *Farnsworth, supra* note 4. Accord *Steffy, supra* note 4.

### (iii) Impact on Noncustodial
### Parent's Visitation

[16-18] The final consideration under *Farnsworth* in assessing the best interests of the child is what impact removal to another jurisdiction would have on the contact between the child and the noncustodial parent.[27] While every move will have some impact, this consideration is chiefly concerned with the ability of the parent opposing the move to maintain a meaningful parent-child relationship after the move.[28] Such assessment must be undertaken in the light of the potential to establish and maintain a reasonable visitation schedule, meaning one that provides a satisfactory basis for preserving and fostering a child's relationship with the nonmoving parent.[29] Indications of the custodial parent's willingness to comply with a modified visitation schedule also have a place in this analysis.[30]

Here, the record indicates that Joel has formed a strong relationship with each of the three children. He exercises all parenting time that he is allotted, is involved in the children's activities, and transports them to activities when needed. He testified that since the divorce, he has periodically exercised the role of "primary caregiver." It is uncontested that Joel's relationship with the children is important to both Joel and the children.

Although Cammy testified that she is willing to accommodate Joel's inperson visitation rights and that Joel can maintain a long-distance relationship with the children via daily phone calls, the record indicates that the move will nevertheless hinder the meaningfulness of Joel's ability to interact with the children. Joel testified that Westfield is approximately

---

[27] See *Farnsworth, supra* note 4. Accord *Ryan G., supra* note 4.

[28] See, *Brown, supra* note 23; *Jack, supra* note 23; *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000); *Farnsworth, supra* note 4.

[29] See, *Ryan G., supra* note 4; *Farnsworth, supra* note 4.

[30] *Farnsworth, supra* note 4.

750 miles, at least an 11-hour drive, from Kearney. This significant distance would make it impractical for Joel to visit in person with his children on most days. Nor could Joel continue to coach the children's hockey and softball teams, teach their 4-H classes, or help to oversee their catechism. And, considering that the children have been accustomed to daily inperson contact with Joel for all of their lives, limiting that contact with the children on most days to phone calls would be a meaningful disruption in their lives.

[19] Obviously, any move away from a parent is likely to hinder that parent's relationship with the child.[31] A reduction in parenting time therefore does not necessarily preclude a custodial parent from relocating for a legitimate reason.[32] But due to the closeness of the parent-child relationship in this case, we find that a move would have a particularly acute negative impact on Joel's ability to visit the children and be a part of their lives. This third consideration under *Farnsworth* hence weighs against removal.

Based on our evaluation of the three considerations discussed in *Farnsworth*, we cannot say that the district court abused its discretion in finding Cammy had not met her burden of showing that removal was in the children's best interests. Cammy's first assignment of error is without merit.

## 2. Change of Physical Custody

Cammy assigns, second, that even if it was not error to deny her request to remove the children, it was still error for the district court to modify the parenting plan to award sole physical custody over the children to Joel. She argues in her brief that the district court's modification of physical custody was unsupported by the evidence and that such error was

---

[31] See *id.*

[32] See, *Hicks v. Hicks*, 223 Neb. 189, 388 N.W.2d 510 (1986); *Little v. Little*, 221 Neb. 870, 381 N.W.2d 161 (1986). See, also, *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2013).

compounded by the fact Joel failed to file a formal pleading raising the issue that custody might be modified. To the contrary, Cammy alleges that Joel's answer denied there had been a material change of circumstances that warranted a change in custody.

[20] We note, as an initial matter, that Cammy has failed to properly assign error based on Joel's alleged failure to seek a change in custody. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.[33]

But the assignments of error section of Cammy's brief states only that "[t]he District Court of Buffalo County Abused its Discretion by Awarding [Joel] Physical Custody [over] the Minor Children." There is no specifically assigned error based on Joel's alleged failure to request a change in custody.

And even if it had been properly assigned, this alleged error is without merit. As best we understand it, Cammy's argument is that she was not afforded notice that her removal action might result in a change of custody over the children. In a similar context, we have stated that when a trial court determines at a general custody hearing that joint physical custody is or may be in a child's best interests but neither party has requested joint custody, due process requires the court to give the parties an opportunity to present evidence on the issue before it imposes joint custody.[34] For example, in *Zahl v. Zahl*,[35] where both parties had only sought sole physical custody over the children and neither party had requested joint custody, we reversed the trial court's award of joint physical custody, reasoning that the parties had not been put on notice prior to trial that joint custody was in issue.

---

[33] See *Cinatl v. Prososki*, 307 Neb. 477, 949 N.W.2d 505 (2020).

[34] See *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019).

[35] *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007), *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019).

In contrast, we found in *Blank v. Blank*[36] that the record indicated both parents had received reasonable notice, "unlike the complete lack of prior notice in *Zahl*." To support that conclusion in *Blank*, we emphasized certain pleadings and testimony that indicated the parents knew or should have known joint physical custody may be an alternative outcome to their requests for sole physical custody.[37]

Cammy points to no opinion in which we have detailed a similar notice requirement prior to a trial court's modification of physical custody during a removal proceeding. Assuming, without deciding, that due process imposes a similar notice requirement in this context, we find that, like in *Blank*, the facts here indicate that Cammy had adequate notice that custody was in issue. In her request for removal, Cammy explicitly prayed for a "[d]etermin[ation] that a material change in circumstances exist[ed] that would warrant a change in custody and state of residence." And although Joel did not explicitly request sole physical custody in his answer, he did allege that if Cammy moved to Indiana, "the [existing parenting plan] would need to be modified." Shortly thereafter, in a motion for temporary orders, Joel requested that "if [Cammy] were to move to the State of Indiana during the pendency of this proceeding[,] that [he] be granted temporary legal and physical custody and control of the parties' minor children." These pleadings are similar to the ones in *Blank* that we found had provided reasonable notice of what was in issue.[38]

Additionally, it is clear from the record that Cammy understood at trial that physical custody was in issue. During cross-examination, she was asked what she intended to do if her removal request were denied. She answered, "If my request

---

[36] *Blank, supra* note 34, 303 Neb. at 613, 930 N.W.2d at 532 (citing *Zahl, supra* note 35).

[37] See *Blank, supra* note 34.

[38] See *id.*

is denied, I will move to Indiana to be with my husband." Then, when pressed about who should have custody over the children if she moved without them, Cammy asserted that physical custody over the children should be changed, either to "joint custody with each other" or to "a flip of the parenting plan that [she had] proposed," meaning that Joel would assume sole physical custody over the children, subject to her parenting time. Considering Cammy's testimony and what was alleged in the pleadings, we find that the record clearly shows she had reasonable notice that custody was in issue.

[21,22] We turn to that issue. In determining if a change in physical custody over the children was appropriate, we abide by a familiar standard: Physical custody over a minor child will not ordinarily be modified absent a material change in circumstances, which shows either that the custodial parent is unfit or that the best interests of the child require such action.[39] Specifically, it is the burden of the party seeking modification to show two elements by a preponderance of the evidence: First, that since entry of the most recent custody order, a material change in circumstances has occurred that affects the child's best interests, and second, that it would be in the child's best interests to change custody.[40]

(a) Material Change in Circumstances

[23,24] A material change in circumstances is an occurrence that, if it had been known at the time the most recent custody order was entered, would have persuaded that court to decree differently.[41] Before custody is modified, it should be apparent that any material change in circumstances alleged will be permanent or continuous, not merely transitory or temporary.[42]

---

[39] See *Weaver, supra* note 1.

[40] See *id.*

[41] See *id.*

[42] *Jaeger, supra* note 24.

[25] We have stated previously that removal of a child from the state, without more, does not amount to a change of circumstances warranting a change of custody.[43] Nevertheless, such a move, when considered in conjunction with other evidence, may result in a change of circumstances that warrants a modification.[44]

For example, in *Brown v. Brown*,[45] we found a material change in circumstances when one parent, who had previously exercised joint legal and physical custody with the other parent, accepted a job out of state. We held that "in cases of joint legal and physical custody, a legitimate reason for leaving the state, taken together with an expressed intent to do so, may constitute a material change in circumstances affecting the best interests of a child, sufficient to require examination of the best interests of the child."[46] In other words, because the two parents' ability to jointly exercise legal and physical custody depended on them living near each other, one parent's move was an occurrence that required a different arrangement.[47]

In *Tremain v. Tremain*,[48] we reached the opposite conclusion where it was unclear if the parent who had sole physical custody and was requesting removal would continue to live out of state even if the children were not allowed to live there with him. We affirmed the district court's denial of removal, but reversed its change in custody, finding no material change

---

[43] See, *Schrag, supra* note 10; *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002); *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002); *Brown, supra* note 23; *State ex rel. Reitz v. Ringer*, 244 Neb. 976, 510 N.W.2d 294 (1994), *overruled on other grounds, Cross v. Perreten*, 257 Neb. 776, 600 N.W.2d 780 (1999).

[44] See *Schrag, supra* note 10; *Tremain, supra* note 43; *Vogel, supra* note 43; *Brown, supra* note 23; *Ringer, supra* note 43.

[45] *Brown, supra* note 23.

[46] *Id.* at 963, 621 N.W.2d at 78.

[47] See *id.*

[48] *Tremain, supra* note 43.

of circumstances had been shown. We found that the custodial parent's mere request for removal, without more, did not necessitate a different custodial arrangement, and that "[t]he court should have ascertained whether [the custodial parent who was proposing removal] would relocate to Nebraska in order to retain custody of the children."[49] Without such an acknowledgment, the removal request alone was not a material change in circumstances.[50]

Here, as in *Brown*, Cammy's ability to exercise sole physical custody over the children depends on their living with or at least near her.[51] And unlike the custodial parent who was proposing removal in *Tremain*, Cammy acknowledged unequivocally that she intends to move to Indiana regardless of whether she is allowed to bring the children to live with her.[52]

[26,27] Upon that unequivocal acknowledgment by Cammy and upon the district court's denial of her request to move the children with her, a different custodial arrangement became necessary. Physical custody, after all, involves the exercise of day-to-day decisionmaking and continuous supervision over a child for significant periods of time.[53] Depending on the child's age and needs, physical custody may include providing suitable shelter, clothing, food, toys, and emotional care.[54] With the children remaining in Kearney, Cammy will not be able to daily and continuously meet those needs for the children after she moves 750 miles away to Indiana.

Therefore, although Joel denied in his answer that there had yet been a material change in circumstances, that did not later preclude the district court from finding as much

---

[49] *Id.* at 336, 646 N.W.2d at 667.

[50] See *id.*

[51] See *Brown, supra* note 23.

[52] See *Tremain, supra* note 43.

[53] See *Brown, supra* note 23. See, also, Neb. Rev. Stat. § 43-2922(20) (Cum. Supp. 2020).

[54] See *Elsome v. Elsome*, 257 Neb. 889, 601 N.W.2d 537 (1999).

upon its denial of Cammy's request for removal. The court's denial—coupled with Cammy's unequivocal acknowledgment that she intended to move to Indiana even if the children could not move there with her—amounted to a material change in circumstances. The first element for a modification of custody was thus met.

### (b) Best Interests of Child

[28,29] The second element for a modification of custody requires consideration of the child's best interests.[55] While the child's best interests is also a consideration in a removal analysis, the relevant consideration in that context is limited to whether remaining with the custodial parent after removal to another jurisdiction would be in the child's best interests.[56] In contrast, here, the relevant consideration is whether changing custody to the noncustodial parent would be in the child's best interests.[57]

[30] Determining whether a change in custody is in the child's best interests requires consideration of various mandatory and permissive factors.[58] Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) requires that certain factors be considered, including (1) the relationship of the child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflcted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse.[59]

[31] Other relevant considerations that may also be considered include the stability of the child's existing routine,

---

[55] See *Weaver, supra* note 1.

[56] See *Ryan G., supra* note 4.

[57] See *Weaver, supra* note 1.

[58] See *Jaeger, supra* note 24.

[59] *Id.*

minimization of contact and conflict between the parents, and the general nature and health of the child.[60] No one factor is dispositive, and various factors may weigh more or less heavily, depending on the facts of the case.[61] The one constant is that the child's best interests are always the standard by which any custody or parenting time decision is made.[62]

Here, the record supports the district court's determination that it is in the children's best interests to change physical custody to Joel. The testimony showed him to be an involved father who coaches the children's hockey and softball teams, teaches the children's 4-H classes, and serves as a councilman for the church in which the children are being catechized. Since Cammy acquired sole physical custody over the children, Joel has only ever missed two of the children's activities, including those occurring on days outside of his parenting time. He testified that he has periodically exercised the role of "primary caregiver."

Cammy herself acknowledged that Joel "has a very loving relationship" with the children, "loves and cares for those children," and "is a good dad." There are no concerns that Joel will fail to meet the children's needs. The children are stable living in Kearney and attending Amherst Public Schools, and they will remain so if Joel is awarded sole physical custody over them.

During his testimony, Joel acknowledged that he works 10-hour shifts, 4 days per week. Yet, the record supports Joel's assertion that during his parenting time, he has still managed to be a present father despite that schedule. On mornings before work, Joel wakes up early to ready the children in time for school. To the extent he needs to work outside of school hours, Joel's neighbors and C.K. are able and willing

---

[60] *Id.*

[61] *Id.*

[62] *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). See *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020).

to supervise the children. And Joel testified that because of a recent promotion, his new role as supervisor entitles him to additional flexibility during the workday. He does not work on weekends or on Fridays, when many of the children's activities take place.

While C.K. did state a preference to live with Cammy rather than with Joel, that preference is entitled to observance among other factors, but is not itself dispositive in determining the children's best interests.[63] Indeed, as the district court found, the weight of other factors tips the other way.

It was thus not an abuse of discretion for the district court to change the parenting plan to award Joel sole physical custody over the children, subject to parenting time with Cammy. Cammy's second assignment of error is without merit.

## VI. CONCLUSION

After considering the facts in this case, we do not find that the district court erred in its assessment of where and with whom Cammy and Joel's children should live. Specifically, it was not an abuse of discretion to overrule Cammy's motion for removal and to modify physical custody.

We therefore affirm the district court's order in this case.

AFFIRMED.

---

[63] See *Jaeger, supra* note 24.