IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


ROEHRS V. ROEHRS


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


GERALD D. ROEHRS, APPELLEE,

V.

ODESSA O. ROEHRS, APPELLANT.


Filed August 10, 2021.    No. A-18-712.


Appeal from the District Court for Lancaster County: ROBERT R. OTTE, Judge. Affirmed.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

Robert Wm. Chapin, Jr., for appellee.


RIEDMANN, BISHOP, and ARTERBURN, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Odessa O. Roehrs appeals the decree of the district court for Lancaster County which dissolved her marriage to Gerald D. Roehrs, divided the marital estate, awarded custody of the parties' three minor children, and ordered child support. We find that the district court did not abuse its discretion in its custody order or decision not to award alimony to Odessa. Therefore, we affirm.

## BACKGROUND

Odessa and Gerald were married in 2001, and three children were born during the marriage. Their daughter, Maegan Roehrs, was born in 2004, followed by a son in 2010 and another son in 2012. In July 2016, Gerald filed a complaint for dissolution of the marriage and requested the care, custody, and control of the children. Odessa filed an answer and also sought primary legal and physical custody of the children.

- 1 -

Trial was held over the course of several days beginning in July 2017 and ending in March 2018. The evidence established that Odessa and Gerald met when Gerald travelled to the Philippines, where Odessa lived. She came to the U.S. on a fiance visa in November 2001, and the parties were married in December. Gerald is 23 years older than Odessa, was married twice prior to his marriage to Odessa, and has two adult daughters from his first marriage. Odessa spoke only broken English when she moved to the U.S. Gerald taught her how to drive upon her relocation, and she obtained her driver's license in January 2002.

Odessa worked as a certified nursing assistant from 2002 through 2013. During that time, she attended college, earning a bachelor's degree in 2011, and ultimately earned a master's degree in Health Care Administration. She generally worked throughout the duration of the marriage, with only brief periods of unemployment. As of the end of trial, she was employed by the Department of Labor, earning $16.96 per hour. She was hired to work 40 hours per week, but her hours are flexible, and sometimes she works less than 40 hours because of the children's schedules.

The marital residence was located in Pleasant Dale, Nebraska. Odessa moved out for brief periods several times throughout the marriage. At the time of trial, Gerald remained in the marital residence in Pleasant Dale, and Odessa had been living in her own residence in Milford, Nebraska, since November 2016. The children attend school in Milford.

Odessa explained that she did not think joint or equal parenting time was in the children's best interests. She testified that she fears for the children's safety when they are with Gerald. She also did not believe that she would be able to get along with Gerald well enough to make joint decisions regarding the children. She acknowledged, however, that she and Gerald had been able to agree on decisions related to the children during the pendency of the divorce proceedings.

Gerald has worked as an HVAC technician for more than 30 years. At the time of trial, he was earning $28.78 per hour and generally worked 40 hours per week. He goes to work an hour late on his weeks with the children, however, because he drops them off at his adult daughter's house where the school bus picks them up.

Gerald acknowledged that he was seeking custody of the children. He explained that he thought he should have custody because he tends to keep the same job and has a secure home, he simply goes to work and goes home, and he is involved with the children's school and activities. He was asked whether he thought he would be able to discuss matters with Odessa and put their personal differences aside to discuss the children, and he said he would like to think they could do so.

The court appointed a guardian ad litem (GAL) for the minor children. The GAL testified at trial that after he was appointed, he discussed the case with the parties and visited with all three children. He ultimately visited with the children and the parties several times. He observed that the two younger children appeared to be clean, happy, and healthy. The GAL testified that he did not get the sense that Odessa and Gerald were unable to communicate regarding the children.

The GAL also spoke with Maegan on several occasions outside the presence of her parents. During those conversations, Maegan voiced concerns to him about her relationship with Odessa. The GAL explained that every time he met with Maegan, she expressed her opinion as to where she would like to live, and the most recent time he met with her, which occurred the same week as his testimony at trial, her statement on that matter was unsolicited. Maegan expressed fear and anxiety when discussing permanent placement with Odessa but not when discussing permanent

placement with Gerald. The court asked the GAL whether he observed anything that suggested to him that continuing the week on/week off parenting plan was not appropriate, and the GAL responded, "With regard to the two boys, no. With regard to Maegan, her statements to me."

Odessa objected to many of the questions asked of the GAL relating to Maegan. At one point, the court asked Gerald's counsel if Maegan was going to testify, and he responded that he anticipated that Odessa would call Maegan to testify. Odessa's counsel indicated that although he included Maegan as a potential witness on his pretrial witness list, it was not his intention or preference to call her to testify. The court then indicated that Gerald's counsel could call her to testify and requested her presence in court later that afternoon.

Later, just prior to Maegan's testimony, Odessa objected to the court calling Maegan as its own witness. Gerald's counsel clarified that he was the one calling her to testify and indicated that she was also included on his pretrial witness list, as he included all witnesses who had been listed by Odessa. The GAL expressed his belief that it would be helpful for the court if Maegan could speak with the judge in camera and confided that at several of his meetings with Maegan she had asked for that opportunity. Maegan ultimately testified in camera where she was questioned by the court, with the parties' attorneys each permitted to briefly cross-examine her.

Maegan was 13, almost 14, years old and in eighth grade at the time she testified. Her grades in school are A's and B's. She was selected for a lead role in her school musical and also participates in choir, basketball, track, and art, plays the flute and ukulele, and is learning to play the drums. Maegan testified in camera and her testimony was sealed. We have reviewed her testimony, and without going into great detail, it is clear that she loves both of her parents and enjoys spending time with each of them. She described positives and negatives about her time at each parent's residence and expressed certain preferences. We will reference her testimony as necessary below to address the arguments raised on appeal.

After trial concluded, the district court entered a decree dissolving the parties' marriage and dividing the marital estate. The court awarded primary care, custody, and control of Maegan to Gerald. Odessa was to receive parenting time with Maegan every other week from Thursday evening through Monday morning, and alternating Wednesday evenings. The parties were awarded joint custody of the two younger children with a week on/week off schedule. The court also allocated holiday parenting time and granted Odessa extra parenting time with Maegan during the summer. Odessa was ordered to pay $173 per month in child support. The court declined to award alimony to either party.

After entry of the decree, Odessa filed a motion to alter or amend and a motion to set aside the judgment. The court clarified certain portions of the decree but generally denied the relief requested. Odessa timely appealed. We note that subsequent to Odessa filing a notice of appeal, the matter was stayed due to a bankruptcy filing. The bankruptcy stay having been lifted and each party having filed its brief on appeal, we now proceed to address the matters raised.

## ASSIGNMENTS OF ERROR

Odessa assigns, renumbered, that the district court erred in (1) ordering compliance with a parenting plan that fails to comply with the Parenting Act and is so vague as to be unenforceable, (2) calling Maegan to testify and permitting her testimony, (3) failing to award her legal and physical custody of all three children, and (4) failing to award her alimony.

STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Onstot v. Onstot*, 298 Neb. 897, 906 N.W.2d 300 (2018). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

ANALYSIS

*Parenting Plan.*

Odessa argues that the parenting plan that the district court implemented is too vague to comply with Nebraska law and to be enforceable. She points out that the decree and parenting plan do not specifically award legal custody or physical custody; rather, they refer to the "care, custody, and control" of the children. Additionally, the parenting plan does not indicate when the parenting time for the two younger children starts. Further, the parenting plan uses the terms "custodial parent" and "noncustodial parent," but if the parties share joint custody, then neither of them is a true custodial parent.

When a parenting plan has not been developed and submitted to the court, the court shall create the parenting plan in accordance with the Parenting Act. Neb. Rev. Stat. § 43-2929(1) (Reissue 2016). A parenting plan shall serve the best interests of the child and shall include, among other things, determinations of legal custody and physical custody of each child. *Id*.

Rather than distinguishing between legal custody and physical custody, the district court here awarded the "care, custody, and control" of the minor children. Although the language of the decree and parenting plan could have been more specific, we do not find that it constitutes an abuse of discretion. This language has previously been used in lieu of the words "legal and physical custody." See, *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021) (custody order should heed both parents' constitutional rights to the care, custody, and control of their child); *Braeman v. Braeman*, 192 Neb. 510, 222 N.W.2d 811 (1974) (trial court's order awarded care, custody, and control of minor children). See, also, *Westerhold v. Dutton*, 28 Neb. App. 17, 938 N.W.2d 876 (2020). We also note that in his complaint for dissolution of marriage, Gerald requested the "care, custody, and control" of the children, and in her answer, Odessa sought "legal and physical care, custody, and control."

Here, in the decree, the district court found that "both parties are fit and proper persons to have the care, custody[,] and control of the three minor children," but it also determined that it was in the best interests of the children "that legal and physical custody be placed with the parties" as provided in the parenting plan attached to the decree. The attached parenting plan awarded primary care, custody, and control of Maegan to Gerald and provided for Odessa and Gerald to "share jointly" the care, custody, and control of the two younger children. Thus, when considering the language of the decree and parenting plan, we understand that when the district court used the term "care, custody, and control" of the children in the parenting plan, it was referring to both legal and

- 4 -

physical custody. As such, it awarded primary legal and physical custody of Maegan to Gerald, and awarded joint legal and physical custody of the two younger children.

Odessa claims that the parenting plan is unclear as to when parenting time begins for the younger children. Indeed, the parenting plan provides for joint custody with Odessa receiving parenting time "every other week at 5:30 p.m. or the conclusion of school or school activities, whichever is later[,] until the following Monday at 8:00 a.m. or the commencement of the school day, whichever is earlier." Odessa raised the same argument in her motion to alter or amend and motion to set aside to the district court, and in its subsequent order, the district court recognized that the decree "could have been clearer" in this regard. It declined to modify the decree or parenting plan, however, referring to the "week on week off schedule" it ordered for the younger children. Accordingly, it is clear that the district court intended to continue the weekly schedule the parties had been following in the temporary joint custody order throughout the pendency of the dissolution proceedings with the transitions to occur on Mondays. In other words, on Odessa's week with the two younger children, she would retrieve them at 5:30 p.m. on Monday or at the conclusion of school or school activities, whichever is later, and they would remain with her until she took them to school the following Monday morning. On that day, Gerald would retrieve them after school or school activities, and they would remain with him until the following Monday morning. We also assume, since this parenting arrangement was to commence in April 2018, now, more than 3 years later, that the parties have been able to work together to interpret and follow the district court's decision.

Finally, Odessa challenges the use of the terms custodial and noncustodial parent in the parenting plan, arguing that use of those terms is vague and unclear. Odessa does not more specifically describe her challenge to the use of these terms in the parenting plan, other than to assert that they are vague.

Section G of the parenting plan outlines summer parenting time and specifically refers to the "10/4 parenting schedule" as it relates to the noncustodial parent during the summer time. The "10/4" schedule applies only to Maegan; thus, the term noncustodial parent refers to Odessa. Otherwise, these terms are used in reference to coordination and cooperation between the parties related to things such as transportation, education, religion, and medical needs.

Because the parties share joint legal and physical custody of the two younger children, they are both custodial parents. See *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000) (parents who share joint legal and physical custody are both custodial parents). Therefore, as the parenting plan outlines, they are to work together to make decisions regarding the younger children. We agree that the language used in the parenting plan could have been more precise. When looking at the manner in which those terms are used, however, we cannot find that it is so vague as to constitute an abuse of discretion. Further, as noted above, the decree was entered in April 2018, more than 3 years ago. We assume that since that time the parties have been able to abide by the terms of the parenting plan.

*Child Custody.*

Odessa assigns two errors related to custody of the children. She claims that the district court abused its discretion when it called Maegan to testify and considered her testimony. In addition, she argues that the court abused its discretion when it failed to award her sole legal and

physical custody of the children. We conclude that the district court did not abuse its discretion in these respects.

We first address Odessa's claim that calling Maegan as a witness was erroneous and prejudicial. Odessa's argument is premised on her position that Maegan was called as a witness by the court itself. Although it was the district court that asked that Maegan be present to testify, at two separate times thereafter, Gerald's counsel clarified that he was the one calling Maegan as a witness. Gerald's pretrial memorandum indicated that he may call any witnesses listed by Odessa to testify at trial, and Odessa included Maegan as a potential witness. Specifically, at trial, Gerald withheld resting his case until after Maegan could testify, informing the court that he did not "have any further witnesses on behalf of [Gerald], other than [Maegan who] will be heard later this afternoon." Thereafter, when Odessa objected to Maegan testifying, Gerald's counsel stated that "obviously, I'm calling the witness. . . . And I would call her. I would ask that she be called." We therefore disagree with Odessa's characterization of Maegan as the district court's witness.

The question, then, is whether it was erroneous for Maegan to testify and for the district court to consider her preferences. In determining custody and parenting arrangements, the court shall consider the best interests of the child, which shall include consideration of the desires and wishes of the child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning. Neb. Rev. Stat. § 43-2923(6)(b) (Reissue 2016). In applying this provision, the Nebraska Supreme Court has specifically held that the wishes of a child are not controlling in determinations of child custody. *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020). Trial courts should consider a variety of factors that bear on the best interests of the child. *Id*. But if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration, alongside other factors. *Id*. The amount of consideration will depend on the child's age and ability to give reasons for his or her preference. *Id*. For example, in cases where we have given the child's stated preference significant consideration, the child was typically over 10 years old. *Id*.

Here, Maegan was 13, almost 14, years old and in eighth grade when she testified. She is academically successful and participates in numerous sports and activities, including playing a lead role in her school musical. She responded appropriately and thoughtfully to the questions posed to her and expressed certain preferences, which appear to be consistent with the opinions she shared with the GAL on multiple occasions. Accordingly, we conclude that Maegan was of an appropriate age and maturity to express her preferences. See *Donscheski v. Donscheski*, 17 Neb. App. 807, 771 N.W.2d 213 (2009) (finding that child who was 12 years old, going into seventh grade, who received mostly A's and B's in school was of sufficient age and intelligence for his preference and reasoning on custody matters to be heard and considered). Thus, it was not an abuse of discretion for the district court to allow Maegan to testify and consider her testimony in reaching its custody decision.

We also find that the district court did not abuse its discretion in its custody order. When custody of minor children is an issue in a proceeding to dissolve the marriage of the children's parents, custody is determined by parental fitness and the children's best interests. *Burcham v. Burcham*, 24 Neb. App. 323, 886 N.W.2d 536 (2016); Neb. Rev. Stat. § 42-364(2) (Cum. Supp. 2020). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Burcham v. Burcham, supra*. Because the district court found that Odessa and Gerald

were both fit parents, a finding that Odessa does not challenge, we consider the children's best interests.

The best interests of a child require a parenting arrangement "for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress." § 43-2923(1). The best interests of a child also require that

the child's families and those serving in parenting roles remain appropriately active and involved in parenting with safe, appropriate, continuing quality contact between children and their families when they have shown the ability to act in the best interests of the child and have shared in the responsibilities of raising the child.

§ 43-2923(3). Section 43-2923(6) further provides:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member[;] and

(e) Credible evidence of child abuse or neglect or domestic partner abuse.

In the present case, the parties operated under a temporary joint custody order during the pendency of the divorce proceedings. Both Odessa and Gerald have certain flexibility in their employment that they are able to get the children to and from school during their parenting time. According to the GAL, the two younger children appeared to be clean, happy, and healthy, and he did not have any concerns with continuing the week on/week off schedule related to those children. He also did not get the sense that the parties were unable to communicate regarding the children. Accordingly, the district court did not abuse its discretion in awarding joint legal and physical custody of the two younger children.

Although the Supreme Court has acknowledged that it is sound public policy to keep children together when possible, considerations of public policy do not, in all cases, prevent the splitting of the custody of the children when a marriage is dissolved; rather, the ultimate standard is the best interests of the children. *Burcham v. Burcham*, 24 Neb. App. 323, 886 N.W.2d 536 (2016), citing *Ritter v. Ritter*, 234 Neb. 203, 450 N.W.2d 204 (1990). Here, the district court found that it would be in Maegan's best interests to place her primary custody with Gerald.

The GAL explained that Maegan voiced concerns to him about her relationship with Odessa and expressed fear and anxiety about permanent placement with Odessa. Odessa argues that Maegan's preferences are not based on sound reasoning, but instead are based, for example, on the fact that she has had a dog and a horse at Gerald's residence and that Odessa spends money on things like winter clothing for the younger children. We understand Odessa's position. After reviewing Maegan's in camera testimony, however, we recognize that she disclosed legitimate

concerns to the court about her relationship with Odessa and observe that her preferences were based on more than those factors Odessa highlights in her brief. Having reviewed all of the evidence presented at trial, we do not find that the district court's decision to award legal and physical custody of Maegan to Gerald was an abuse of discretion.

*Alimony.*

Odessa assigns that the district court abused its discretion in failing to award her alimony. We disagree.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id*.

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id*. In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id*. The ultimate criterion is one of reasonableness. *Id*. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id*.

In this case, Odessa relocated to Nebraska from the Philippines shortly before she and Gerald were married. She was only 18 years old at the time and did not speak fluent English. However, within 6 months of moving to Nebraska, she obtained her driver's license and, a few months later, she began working. She was employed consistently throughout the marriage and earned both a bachelor's degree and a master's degree prior to the parties' divorce.

At the time of trial, Odessa was earning $16.96 per hour. She acknowledged, however, that with her master's degree, she had the potential to earn $45,000 per year. Gerald was earning $28.78 per hour, generally working approximately 40 hours per week. For purposes of calculating child support, the district court utilized a total monthly income of $2,250 for Odessa and $3,996 for Gerald.

Odessa has parenting time with the younger children every other week and alternating weekends with Maegan. She explained that she was hired to work 40 hours per week, but her hours are flexible and she occasionally works less than 40 hours because of her time with the children. Overall, however, she is able to engage in employment without interfering with the interests of the minor children. The foregoing evidence establishes that both parties worked throughout the duration of their marriage and participated in raising their children. Odessa was able to complete her education and improve her income and earning potential. The parties share custody of the younger children, while Maegan spends more time with Gerald. We therefore conclude that the district court's decision declining to award alimony was not an abuse of discretion.

## CONCLUSION

For the foregoing reasons, we find that the district court's custody decision was not an abuse of discretion. Further, the court did not abuse its discretion in failing to award alimony to Odessa. We therefore affirm the district court's order.

AFFIRMED.