IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ALAN A.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ALAN A., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

NATALIE A., APPELLANT, AND BUCKLEY A., APPELLEE AND CROSS-APPELLANT.

Filed March 22, 2022.    No. A-21-561.

Appeal from the County Court for Richardson County: CURTIS L. MASCHMAN, Judge. Affirmed.

Keith M. Kollasch, of Kollasch Law Office, for appellant.

Alexandra E. Fleming, Deputy Richardson County Attorney, for appellee State of Nebraska.

Alan D. Martin for appellee Buckley A.

Diane L. Merwin, of Fankhauser, Nelsen, Werts, Ziskey & Merwin, P.C., L.L.O., guardian ad litem.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Natalie A. appeals, and Buckley A. cross-appeals, from the decision of the county court for Richardson County, sitting as a juvenile court, terminating their parental rights to their son, Alan A. We affirm.

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

Natalie and Buckley are the biological parents of Alan, born in 2012. On August 15, 2019, law enforcement found Alan, 7 years old, home alone during a welfare check of the child. Alan was removed from the home, taken into emergency custody, and placed with the Nebraska Department of Health and Human Services (DHHS).

On August 16, 2019, the State filed a petition alleging that Alan fell within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because: he lacked proper parental care by reason of the fault or habits of his parents, Natalie and Buckley; his parents refused to provide proper or necessary subsistence, education, or other care necessary for his health, morals, or well-being; his parents neglected or refused to provide special care made necessary by his mental condition; or because he was in a situation injurious to his health or morals. The State more specifically alleged the following: Alan was residing with Natalie at the time of removal. Buckley was not permitted to reside in the home with Natalie or Alan because of two active domestic abuse protection orders. A welfare check was done on Alan on August 15, 2019, and he was found to have been left at home alone by Natalie. Alan stated that Natalie told him she was leaving and not returning, and that she did not want him anymore. Law enforcement had responded to numerous calls at the family's residence due to allegations of domestic violence and harassment between Alan's parents over the past year. There were allegations of domestic violence occurring in the home with Alan present and protection orders against Buckley were granted for Natalie and Alan. However, neither Natalie nor Buckley fully adhered to the terms of the protection orders, thereby subjecting Alan to parental discord and violence. Alan was previously adjudicated in the same court due to domestic violence and weapons being present around him, and as a result, he was placed outside of the parental home from March 14, 2016, to February 22, 2017. After termination of that case, there continued to be numerous intakes made to DHHS pertaining to domestic violence. Immediately prior to Alan's removal on August 15, 2019, there was a voluntary case ongoing with DHHS due to concerns for Alan's safety and well-being; the above facts placed him at risk of harm.

Also on August 16, 2019, the State filed a motion for temporary custody of Alan to be placed with DHHS. In its ex parte custody order entered on August 19, the juvenile court noted it was advised that Alan had been taken into emergency custody and placed with DHHS on August 15. The court ordered continued temporary custody and placement with DHHS. Alan has remained in the custody of DHHS ever since.

A contested adjudication hearing was held on November 20, 2019. Following the hearing, the juvenile court entered a journal entry and order on November 25 wherein it sustained the allegations in the petition and adjudicated Alan as being within the meaning of § 43-247(3)(a). The court stated that no direct contact by parents was authorized at that time; DHHS was to "assess with therapist(s) for juvenile, whether the sending of cards, letters, or gifts would be against the interests of the juvenile," and then advise the parties as soon as possible.

A disposition hearing was held on January 22, 2020; several review hearings were held between April and November 2020, and another review hearing was held in February 2021. The case plans and goals have remained relatively the same throughout this case. Natalie and Buckley were ordered to: complete psychological and psychiatric evaluations and follow recommendations;

complete updated evaluations as ordered; complete substance abuse evaluations and follow all recommendations; complete drug and alcohol testing and remain free from all substance abuse; complete parenting evaluations; complete a parenting course; complete domestic violence assessments; participate in individual therapy; participate in family support services; and build a steady, safe environment with long-term sustainable housing and a strong, healthy support network. Additionally, Natalie was to become self-sufficient and resolve any outstanding warrants.

In a journal entry and order entered on February 19, 2020, the juvenile court denied "the motion to start visitation with mother." The court adopted exhibit 8 as a parental contact plan and the parties were ordered to comply with its terms to reestablish contacts with Alan. The parental contact plan had different phases for contact with Alan. In "Phase 1," the parents could "send one letter per week to Alan through [DHHS] who will review it for appropriateness and then forward [sic] to the therapist for Alan to review with him and process as deemed therapeutically appropriate." In phase 1, the parents were to also complete their psychological evaluations and follow any recommendations, begin and consistently attend domestic violence programming, and comply with regular and random drug and alcohol testing. When the parents' individual therapists and Alan's therapist agreed that all participants were ready, visitations would progress to the next phase. In "Phase 2," there would be therapeutic phone calls, with progression to family therapy when all parties were ready.

On December 21, 2020, the State filed a motion to terminate Natalie's and Buckley's parental rights to Alan pursuant to Neb. Rev. Stat. § 43-292 (Reissue 2016), specifically: subpart (2), parents substantially and continuously or repeatedly neglected and refused to give Alan necessary parental care and protection; subpart (6), reasonable efforts to preserve and reunify the family failed to correct conditions leading to Alan's adjudication under § 43-247(3)(a); and subpart (7), out-of-home placement for 15 or more of the most recent 22 months. The State also sought to terminate Natalie's parental rights pursuant to § 43-292(1)--Natalie abandoned Alan for 6 months or more immediately prior to the filing of the petition. The motion alleged that termination of Natalie's and Buckley's parental rights was in Alan's best interests.

2. TERMINATION HEARING

A hearing on the motion to terminate Natalie's and Buckley's parental rights was held over the course of 3 days in June 2021. Numerous witnesses testified and several exhibits were received into evidence. A summary of the relevant evidence follows.

(a) State's Evidence

*(i) Events Prior to August 2019 Removal*

Steven Young, a children and family services specialist with DHHS, testified that he has been familiar with this family since "the first time we had an intake on the family" in 2013 or 2014. In 2016, law enforcement removed Alan from his parents because of domestic violence in the home, and a juvenile petition was filed. Alan was adjudicated in that case as being within the meaning of § 43-247(3)(a) because of domestic violence in the home; while Alan was present, Natalie assaulted Buckley with a knife and threatened to kill herself. Alan remained out of the home from March 2016 to February 2017. It appears that jurisdiction was eventually terminated in that case in October 2017.

According to Young, in September and December 2018, DHHS received new intakes on the family. There were allegations of domestic violence made against Buckley, and ex parte domestic abuse protection orders were granted for Natalie and Alan against Buckley. During a forensic interview, Alan disclosed having witnessed his father hit his mother.

Young testified that in January 2019, DHHS received intakes alleging that Buckley was violating the protection order, Natalie was brandishing a gun on her porch, and that people were driving by Natalie's residence unannounced. At that point, Natalie was offered voluntary services such as family support, and Natalie was amenable to voluntary services. In March, there was another intake alleging domestic violence between Natalie and Buckley--that Natalie's foot had been possibly run over by Buckley's vehicle as he was attempting to leave her residence. Natalie attempted to get the protection orders against Buckley dismissed, but her request was denied by the district court. In April, Natalie reported that she had withdrawn Alan from school and they were in a battered women's shelter in Iowa; family support was closed at the end of April because there was no information to suggest that Natalie was in Nebraska.

Young stated that in June 2019, DHHS received another intake alleging that Buckley was violating the protection order and harassing Natalie; DHHS started services again by the end of the month. In July, DHHS received intakes alleging that Buckley was violating the protection order and that Natalie brandished a shotgun and thought there were trespassers on the property. A second forensic interview was conducted with Alan wherein he disclosed being locked in the basement with his mother, witnessing his dad having his "'pee-pee in her butt,'" and describing not wanting anyone to hurt his mother. The case was transferred to a different caseworker on August 5.

Young stated that prior to Alan's removal in August 2019, there were "at least 40 [intake] entries" for this family, and "the most consistent theme would be domestic violence allegations"; "most" of the intakes were deemed "unfounded," meaning "[t]here is no legal charge of abuse/neglect[,] [t]here is no criminal charge being filed." In the district court for Richardson County, Buckley pled no contest to violating a protection order in two separate cases in July and September 2019.

Law enforcement officers from the Richardson County sheriff's office testified that based on their contacts with the family, there have been concerns about Natalie's mental health, drug use by Natalie and Buckley, and domestic violence.

In 2019, prior to Alan's removal, the sheriff's office received around "a hundred" calls for assistance to the family's farm residence where Natalie and Alan lived, and "[t]here were times that there were four to five calls in a day." Natalie would call saying that Buckley was there harassing or assaulting her. She also made numerous calls stating that people were on the property. Once she discharged a shotgun because she said there were people there, and once she said there were people in the field and that there were people coming out of the roof. Natalie repeatedly reported seeing things that could not later be verified, e.g., someone standing in the combine holding a chainsaw, or Buckley hiding in certain places on the property (law enforcement asserted that it would not be possible for Buckley to have hidden in those locations due to his size). There were also times when Alan called the sheriff's office "because Daddy was being mean to Mommy," or because someone was trying to take a vehicle from the property. In a June call about the vehicle, Natalie could be heard telling Alan to stand in front of or behind the truck to prevent the truck from being taken.

In July 2019, law enforcement received a call from a man who had received text messages from Natalie saying that she and Alan were being kept against their will at Buckley's house. Law enforcement learned that Natalie and Alan had been at Buckley's house for a couple days for Alan's birthday, but Natalie also stated that Buckley had raped her. Buckley was arrested on two counts of violating a protection order. About a week later, law enforcement responded to Buckley's house in reference to a burglary that occurred while he was in jail; things were stolen and the house was a mess. Buckley believed that Natalie was the one who burglarized the home.

### (ii) August 2019 Removal

Sergeant Clinton Stonebarger of the Richardson County sheriff's office testified that on August 15, 2019, he was dispatched to Natalie's residence in Dawson, Nebraska, for a welfare check on Alan, age 7; Natalie had been seen in Auburn, Nebraska, and there was a concern that Alan was home alone. Sergeant Stonebarger believed Buckley called for the welfare check, and when the sergeant made contact with Alan, he found him home alone. Alan told Sergeant Stonebarger that his mother had left, having told Alan that she did not want him anymore and that she was not coming back. The sergeant took Alan to the Richardson County sheriff's office. During the drive, the sergeant asked Alan if he had eaten that day, and Alan said that the only thing he had was a peanut butter and jelly sandwich that his father had made him. Alan also reported that his mother had locked him out of the house because she wanted his father to take him. He said he found his father in the garage, but his father left at some point because he did not want law enforcement to find him there. According to Alan's statements to Sergeant Stonebarger, Alan's mother left the residence after his father left the residence. At the time, there were active protection orders for Alan and Natalie against Buckley. Almost 2 hours after Alan was removed from the home, Natalie called the sheriff's office "regarding where her son was at"; at some point she told Sergeant Stonebarger that she had video of Buckley kidnapping Alan. Several phone calls took place and several times she was told to come to the sheriff's office, but she never came to the office to follow up.

Richardson County Sheriff Rick Hardesty testified that when Natalie called the sheriff's office on August 15, 2019, he informed her that she needed to come to the office so they could discuss Alan, but she said she was not coming to the office, that she just wanted to get her son back. Sheriff Hardesty stated, "we, more than likely, were going to place her under arrest for abandonment or child neglect" because Alan had been home by himself. Natalie never came to the sheriff's office and they were not able to locate her.

Sergeant Jeff Fredrick of the Richardson County sheriff's office testified that on August 26, 2019, he arrested Natalie at the courthouse on a "confirmed warrant" for burglary. During the booking process a baggie of methamphetamine was found on her person. The possession led to an additional charge.

### (iii) Parents' Progress From August 2019 to September 2020

Jessica Holliday testified that she has been the DHHS children and family services supervisor for this case since Alan's removal on August 15, 2019. The caseworker assigned to the case from August 2019 until September 2020 did not testify, but Holliday testified about what occurred during that caseworker's time on the case. Holliday stated that DHHS made reasonable

efforts as it pertained to the parties. DHHS offered many services including family support, mental health evaluations, substance abuse evaluations, and urinalysis testing, but were told by the parties they did not need help from DHHS.

Holliday testified about the parents' compliance, or lack thereof, with the case plan requirements from August 2019 to September 2020. Natalie did not complete a substance abuse evaluation, required drug testing, or a parenting evaluation. Natalie did complete a psychological evaluation in December 2019, and the recommendations from the evaluation were that she participate in cognitive therapy, attend therapy on a consistent basis, and drug test; Natalie did not follow the recommendations. It was difficult to contact Natalie regarding getting releases signed for any therapy she was attending. DHHS was able to contact Natalie's individual therapist towards the end of August 2020 and it was reported that Natalie had met with the therapist only a few times during that year. Natalie was "constantly moving" and she reported being in Nebraska, Colorado, Florida, and Illinois. DHHS was never able to figure out where she lived or if she had a sustainable residence. When DHHS had contact with Natalie, she was "very hard to follow" and the focus of Natalie's conversations was that she was displeased with Richardson County, as well as the things that Buckley had done to her, and she "[v]ery rarely" asked how Alan was doing. Natalie reported "working with Broadway," traveling to and from New York to be on "Good Morning America," and being a voice coach on "American Idol" as well as "The Voice," but DHHS was never able to verify her employment. Around August, Natalie had outstanding warrants and had not complied with the juvenile court's order to address those warrants.

According to Holliday, it was difficult to communicate with Buckley because he would change his phone number, was incarcerated, or would refer DHHS to his attorney. Buckley eventually obtained a substance abuse evaluation, but it was reported that he was not completely honest regarding his answers and would not talk about anything regarding the past, so the provider was not able to give a full recommendation. The juvenile court ordered Buckley to obtain an updated evaluation, which he completed in July 2020; there were no recommendations from that evaluation. Buckley did not attend a team meeting until July. He was required to comply with drug testing and had a negative drug test in August; however, prior to and after that, he was noncompliant with testing. Buckley did not complete a psychological evaluation, domestic violence classes and therapy, or a parenting evaluation. DHHS was never able to verify whether Buckley was employed. Holliday stated that Buckley was incarcerated from October 2019 to February 2020, from September to November 2020, and again in June 2021.

Holliday testified that when Alan was first removed, there was no visitation until he could receive the appropriate evaluations. A parental contact plan was adopted by the court, which we have set forth previously. Holliday stated that Natalie did not provide appropriate weekly letters to Alan. When letters were sent, "[v]ery little" could be shared with Alan because they were inappropriate, e.g., Buckley was to blame and that Alan would be with her soon. Natalie completed a psychological evaluation, but DHHS did not know if she complied with any recommendations because she did not sign a release of information. As reported by her therapist, Natalie did not consistently participate in therapy. Additionally, Natalie did not comply with regular drug testing. Thus, she did not complete phase 1 of the contact plan.

Holliday stated that until April 2020, Buckley did not provide consistent letters, but after April he did consistently provide letters. However, Buckley did not comply with the psychological

evaluation, domestic violence programming, or drug and alcohol testing. Thus, Buckley never completed phase 1 of the contact plan. Despite not completing phase 1, Buckley was offered the opportunity to move to therapeutic phone calls in July or August 2020, but he was not able to take advantage of those calls because he was incarcerated.

Sheriff Hardesty testified that in September 2020, he executed a search warrant for controlled substances at Buckley's home and "close to seven grams of methamphetamine," drug paraphernalia, and a shotgun were found during the search. Buckley was arrested and charged with possession of methamphetamine with intent to deliver and possession of a firearm during the commission of a felony; according to the criminal information, he was also charged with possession of drug paraphernalia.

### (iv) Parents' Progress From September to December 2020

Kacie Hendrickson, a DHHS children and family services specialist, testified that she was assigned to Alan's case from September to December 2020. During her time on the case, Hendrickson was concerned about Natalie's mental health because it was hard to track what she was saying. Hendrickson did not know where Natalie was residing. Natalie told Hendrickson that she was in Florida, but letters to Alan were sent from Illinois and medical documents were from Kentucky and Tennessee. Because Hendrickson did not have a location for Natalie, she could not set up drug testing or confirm whether Natalie was using any substances. Hendrickson stated that Natalie refused to return to Nebraska because she was fearful of Buckley and mentioned that law enforcement was against her; Natalie did not take any steps to address her active warrants. Hendrickson was not able to verify Natalie's reported employment "doing Broadway." Natalie did not consistently send written letters for Alan, and the letters she did send contained inappropriate content. Natalie did not complete a trauma-focused parenting course or a domestic violence class, and she did not participate in family support. Additionally, Natalie did not consistently attend individual therapy. Hendrickson stated that according to Natalie's therapist, Alan should stay where he was at and that being with Natalie was not good for Alan. In Hendrickson's opinion, it would not be in Alan's best interests to be returned to Natalie's care.

Hendrickson stated that Buckley completed the psychological evaluation in December 2020, and there was a parenting component along with that evaluation. However, he did not participate in individual therapy or complete a domestic violence course. Buckley's letters to Alan were appropriate, but not consistent. Additionally, Buckley was incarcerated for most of the time that Hendrickson was his case manager, so he was not meeting his goal of maintaining a safe and stable home for Alan. In Hendrickson's opinion, it would not be in Alan's best interests to be returned to Buckley's care.

### (v) Parents' Progress From December 2020 to
### Termination Hearing in June 2021

Ashley Houghton, a DHHS children and family services specialist, testified that she was assigned to Alan's case in December 2020, and was his case manager at the time of the termination hearing. Houghton said DHHS had concerns about Natalie's mental health throughout this case. Natalie was sometimes difficult to follow, and it was hard to know whether what she was saying was true or not true. Natalie did not complete a substance abuse evaluation and was not

participating in random drug testing. She did complete a psychological evaluation in December 2019, but she did not follow recommendations from the evaluation. Houghton spoke to Natalie's therapist in March 2021, and the therapist said they were working on communication, eye contact, and Natalie's post-traumatic stress disorder diagnosis. Natalie and her therapist were not yet working on anything related to the trauma Alan had experienced. Natalie had not completed a trauma-focused parenting course, a domestic violence program, or joined a support group. Natalie had not shown that she was able to care for Alan's needs. For "most of the [team] meetings," Natalie's focus was not on Alan; instead, her focus was on herself and blaming others for the situation. Additionally, Houghton had received only seven letters from Natalie for Alan since December 2020. Houghton did not get a physical address for Natalie until May 2021, and according to Houghton, Natalie did not reside in Nebraska. Natalie testified that she did not want to share her address with DHHS because she was afraid that Buckley would find out where she lived. According to Houghton, Natalie had not made any significant progress in completing her goals. Houghton believed that Alan needed permanency, and in her opinion, it would not be in Alan's best interests to be returned to Natalie's care.

According to exhibits received into evidence, in April 2021 in the district court for Richardson County, Natalie pled no contest to attempted possession of a controlled substance in one case. Additionally, she was charged in a separate case with possession of methamphetamine and "obstructing government operation"; both charges in this case arose from incidents alleged to have occurred in October 2019.

Houghton testified that Buckley started a domestic violence course in March 2021, and he had attended eight sessions so far. Buckley also started attending therapy in March, but Houghton stated that she received progress reports that there had been no progress made due to Buckley's inability to identify any needs to work on and his denial of any domestic violence and substance use. Buckley lost his house in a May fire and was arrested for possession of methamphetamine at that time, so he was not meeting his goal of maintaining a safe and stable home for Alan. Buckley had been doing random drug testing since March, but Houghton was made aware that a "Whizzinator" was found at Buckley's home at the time of his May arrest, and that item called into question the validity of urinalysis testing. A law enforcement officer testified that the Whizzinator, found during the execution of a search warrant, is "a fake penis design" "which is used to falsify urinalysis"; the Whizzinator found during the search still had a "trace amount" of "synthetic urine" in it. Additionally, Houghton testified that Buckley had not completed a parenting evaluation that focused on children with trauma, had not taken responsibility for Alan's trauma, and had not shown that he understood Alan's trauma. According to Houghton, Buckley had not made any significant progress in completing his goals. Houghton believed that Alan needed permanency, and in her opinion, it would not be in Alan's best interests to be returned to Buckley's care.

Deputy Joshua Townsend of the Richardson County sheriff's office testified that on May 29, 2021, he was dispatched to Buckley's residence for a house fire. Deputy Townsend observed Buckley walking around by a dresser drawer; a straw with a white substance was observed and field tested positive for methamphetamine. Buckley was arrested and charged with possession of a controlled substance, methamphetamine; according to the criminal complaint, he was also charged with possession of drug paraphernalia.

*(vi) Alan's Progress*

According to Holliday, when Alan was first removed and placed in foster care he was "very explosive," could not cope with redirection, was self-harming, would wet the bed, was "very, very terrified that somebody was going to find him and kidnap him from the foster home," was "very emotional" and angry at his parents, and "was just a very, very traumatized little boy." Alan has since made progress. He excelled at school, made friends, better managed his emotions, and no longer stated that he was afraid someone was going to kidnap him.

Dru McMillan testified that she is a therapist and specializes in "children who are involved with foster care or adoption and/or who have experienced trauma." McMillan began working with Alan in March 2020 and diagnosed him with "[p]ost-traumatic stress disorder, chronic." She said his underlying trauma was abuse and neglect that occurred when living with his parents, as well as witnessing domestic violence. McMillan stated that the foster parents reported that when he first came to live with them he was dysregulated, could not sit still or focus on any one task for any length of time, was constantly on edge, had frequent nightmares, engaged in trauma reenacting play, was afraid that his location with his foster parents would be disclosed and that somebody would find him and hurt him, had difficulty with age-appropriate social skills, and had a lot of tantrums.

McMillan met with Alan weekly, and he "talk[ed] a lot about witnessing conflict between his parents, about his parents arguing and fighting verbally"; "hearing his mom screaming and crying in his parents' bedroom"; "a specific incident where his dad had a gun and was threatening to kill himself" and he and his mother had to talk his father out of killing himself; "being locked in a dark, small room, particularly the bathroom"; and "punishments, including being grabbed by the ear and having his face put in a sink of water." McMillan worked with Alan to help him learn how to identify emotions and cope with different feelings in a healthy way. Then, because Alan was "at a really stable foster home with foster parents who have consistently followed through on treatment recommendations," Alan was able to "move into trauma work in a positive way." McMillan stated that "[t]ypically," if the goal was reunification, she would involve both the biological and foster parents, because "a huge part of trauma work is the parenting skills" to help and support Alan. However, McMillan did not allow Natalie and Buckley to be involved in the trauma work because they did not meet the requirements of the parental contact plan.

According to McMillan, Alan has made "tremendous progress." McMillan stated that Alan loves and misses both of his parents, "but he has also made it very clear that he does not feel safe with them." "[Alan] has said he, at this point, does not want to be placed back with his parents unless they can absolutely show a hundred percent that they are vested and, right now, he just wants to stay where he's at." According to McMillan, "it would absolutely destroy him to go home to a situation in which parents were not fully ready to parent him in the way in which he is now used to being parented, in a way which is healthy and fulfills his needs fully." Once Natalie and Buckley took accountability and did everything they were asked to do, McMillan anticipated it would take "no less than 12 to 18 months" to get to the point of reunification. McMillan said Alan needs permanency and consistency, and "it needs to be immediate, at this point, after this length of time in care." Alan's court-appointed special advocate also agreed that at this point, it is Alan's best interest to have permanency.

### (b) Guardian ad Litem's Evidence

Alan's guardian ad litem called Jennabella V. to testify. Jennabella, 19 years old, is one of Natalie's three adult children. Jennabella testified that when she was going into fifth grade, she began living with Natalie and Buckley. When Alan was around 6 to 8 months old, Natalie and Buckley went on an out-of-state work trip for "[t]hree and a half weeks to a month," and left Alan with Jennabella; she said she was 12 or 13 years old at the time. Natalie testified that Jennabella's testimony was "definitely a lie." Buckley specifically denied leaving Alan at home with Jennabella for several weeks when he was a baby and stated "that's just absurd." Buckley said that when Alan was 6 months old, they took him to Venezuela for a month to see Natalie's father. Jennabella was supposed to go with them, but she ended up staying with Natalie's relative, "movie star . . . Demi Moore."

Jennabella stated that about halfway through her seventh grade year, she went to live with her father. Thereafter, Jennabella did not stay with Natalie very often because she "didn't really feel safe there." Jennabella witnessed Buckley physically assault Natalie, and "[t]hey always ran around the island that was in the kitchen, with knives at each other." Jennabella was never threatened, "but there was a time where [she] did get in the middle of one of [Natalie and Buckley's] physical fights and was hit" trying to protect Natalie. Jennabella continued to visit Natalie's home "for Alan" and was worried for his safety; Jennabella taught Alan how to call 9-1-1 when he was around 3 or 3½ years old.

Jennabella has been able to have a relationship and contact with Alan since he was removed from Natalie's home in August 2019. Jennabella said she was "pretty involved in his life" and tried to "FaceTime him at least three times a week." She had also been involved in Alan's therapy. Jennabella had "definitely seen him go from zero to a hundred percent" in his academic abilities. She did not think that Alan should be returned to Natalie and Buckley, and she believed that it was in Alan's best interests to terminate their parental rights.

### (c) Parents' Evidence

Buckley testified that during his relationship with Natalie, she had three protection orders put in place against him. In the first juvenile court case, he completed a domestic violence program that had 36 sessions. He was currently involved in a domestic violence program and had attended nine sessions so far. He also completed one or two substance abuse evaluations.

Since August 2019, Buckley spent 124 days in jail for violating a protection order. He also spent 67 days in jail after he was charged with the first possession of methamphetamines with intent to deliver and firearms charges. Then in May 2021, he spent another 4 or 5 days in jail before he bonded out on charges of possession of methamphetamine. Buckley currently had charges against him for possession with intent to distribute methamphetamine. He claimed the charges against him were not true, but that he applied for drug court because his "lawyer said that'd be the cheapest way of doing it." He received a notice that the drug court did not find him to be a suitable candidate. Buckley denied ever seeing drugs in his house before the "police raids," but he had others living with him and they had access to every part of his home. Buckley denied ever using a Whizzinator.

Natalie testified that she participated in a mental health examination in December 2019. She also participated in a psychological examination in March 2020 in Florida and she said they

recommended post-traumatic stress disorder therapy. Natalie started therapy in Florida and currently saw a Lincoln, Nebraska, therapist weekly. Natalie also claimed to have completed a substance abuse evaluation "[s]ometime along the way" with a "neurologist or neurosurgeon in Florida." Natalie was "in the hands, always, of . . . neurologists, neurosurgeons, neuropsychologists" because she had "epilepsy . . . from the age of 19." She has blood work done every 6 weeks "and all those blood works show everything of my panel, including drugs." When asked if she ever forwarded those results to DHHS, she said she "gave them releases to speak to doctors," and she believed, but was "not a hundred percent sure," that she signed releases with the medical providers.

Natalie said she was "federally disabled," and part of her disability was "an injury-induced stroke" due to "[s]trangulation" by Buckley. Natalie confirmed her history of domestic violence with Buckley, attributing "[f]ive broken bones" to that violence. She filed for protection orders many times and active protection orders were in place at the time of Alan's removal. Natalie claimed that she completed domestic violence classes after Alan's removal.

Throughout this case, Natalie has been in Nebraska, Florida, Indiana, and Illinois. She said she has been in Illinois since she left Nebraska, "that is my main address," but she also stayed with family in the other states. Natalie kept in contact with DHHS through email and text messages and said, "I didn't tell them exactly where I was, but I did tell them my -- the city and the state." When asked if she gave DHHS an address of where she was staying, she responded, "At times." She was currently living in Illinois.

### 3. JUVENILE COURT'S DECISION

In its journal entry and order entered on July 2, 2021, the juvenile court found by clear and convincing evidence that statutory grounds for termination existed pursuant to § 43-292(2), (6), and (7). The court also found that Natalie and Buckley were unfit and that termination of their parental rights was in Alan's best interests. The court terminated Natalie's and Buckley's parental rights to Alan.

Natalie appeals, and Buckley cross-appeals.

### III. ASSIGNMENTS OF ERROR

Natalie assigns, summarized and restated, that the juvenile court erred in finding that (1) statutory grounds existed to terminate her parental rights pursuant to § 43-292(2), (6), and (7); and (2) she was unfit and termination of her parental rights was in Alan's best interests.

Buckley assigns on cross-appeal, summarized and restated, that the juvenile court erred in (1) finding that statutory grounds existed to terminate his parental rights pursuant to § 43-292(2) and (6), (2) finding that he was unfit and that termination of his parental rights was in Alan's best interests, (3) not understanding that he was functionally illiterate and not ordering the State to provide him assistance in writing effective letters to Alan, (4) refusing to allow him to have telephone or video contact with Alan or intervention counseling with Alan, and (5) "not furthering the conduction of an ICPC investigation" despite Buckley offering his brother in Kentucky as a potential placement for Alan.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

In Nebraska, the grounds for terminating parental rights are codified in § 43-292. That statute contains 11 separate subsections, any one of which can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Mateo L. et al., supra.* It is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al., supra.*

### 1. STATUTORY GROUNDS FOR TERMINATION

Natalie and Buckley both assign errors related to the statutory grounds underlying the termination of their parental rights. The State sought to terminate Natalie's and Buckley's parental rights under § 43-292(2), (6), and (7); and additionally sought to terminate Natalie's parental rights under § 43-292(1). The juvenile court found § 43-292(2), (6), and (7) existed by clear and convincing evidence.

We note that some of the briefing to this court erroneously references § 43-292(7) in the context of parental unfitness. However, § 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra.* Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra.* In other words, if the 15-out-of-22 months formula is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra.* In this case, Alan was removed from Natalie's home on August 15, 2019. He remained out of home through at least June 18, 2021, when the termination hearing ended. That period satisfies the 15-out-of-22 months formula.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating the parental rights of both Natalie and Buckley. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning the other statutory bases for termination. *In re Interest of Mateo L. et al., supra.*

Furthermore, we note that because we do not consider whether termination of parental rights was proper pursuant to § 43-292(6), Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2020), which requires reasonable efforts to reunify families, is not applicable to the instant case. Section 43-83.01 is only incorporated into § 43-292(6), not into the remaining subsections of § 43-292. See *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). See, also, *In re Interest of Mateo L. et al., supra* (reasonable efforts to reunify family required under juvenile code

- 12 -

only when termination is sought under § 43-292(6)). We next consider whether termination is in Alan's best interests.

## 2. BEST INTERESTS AND UNFITNESS

Natalie and Buckley assign errors to the juvenile court's determination of parental unfitness and Alan's best interests.

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, this family's history with DHHS goes back to at least 2016 where, in a previous juvenile court case, Alan was adjudicated as being within the meaning of § 43-247(3)(a) because of domestic violence in the home. Alan remained out of the home from March 2016 to February 2017. It appears that jurisdiction was eventually terminated in that case in October 2017. Less than 1 year later, in September 2018, DHHS started receiving new intakes on the family, many of which involved allegations of domestic violence. Prior to Alan's removal in 2019, there were numerous DHHS intakes, around "a hundred" calls to law enforcement for assistance, four protection orders, and a voluntary case.

In the current juvenile case, Alan, 7 years old, was found home alone and told law enforcement that his mother had left, having told him that she did not want him anymore and that she was not coming back. Alan also told law enforcement that he had seen his father that day despite there being a protection order in place. Since Alan's removal in August 2019, Natalie and Buckley have made little progress.

Natalie completed a psychological evaluation in December 2019, but she did not follow recommendations from the evaluation. At the time of the termination hearing, she had not completed a substance abuse evaluation or participated in random drug testing, and she had not completed a trauma-focused parenting course, a domestic violence program, or joined a support group. She had been working with a therapist, but as of March 2021, had not yet worked on anything related to the trauma Alan had experienced. Natalie had not shown that she was able to care for Alan's needs. For most of the team meetings, Natalie's focus was not on Alan, instead her focus was on herself and blaming others for the situation. Additionally, Natalie did not send consistent, appropriate letters to Alan, and had not completed phase 1 of the parental contact plan.

Several of the State's witnesses testified that Alan needed permanency and that it would not be in his best interests to be returned to Natalie's care.

Buckley was incarcerated for nearly 200 days during this juvenile case. He did complete an updated substance abuse evaluation in July 2020. And he completed some drug testing, but there was concern regarding his results as a Whizzinator device was found during the execution of a search warrant. His pending drug charges were also cause for concern. It was not until March 2021 that Buckley started a domestic violence course, and he had attended eight sessions by the time of the termination hearing. He also started attending therapy in March, but apparently had not been making progress due to his inability to identify any needs to work on and his denial of any domestic violence and substance use. At the time of the termination hearing Buckley had not completed a parenting evaluation that focused on children with trauma, had not taken responsibility for Alan's trauma, and had not shown that he understood Alan's trauma. Additionally, while Buckley had been fairly consistent in sending letters to Alan, he had not completed phase 1 of the parental contact plan. Several of the State's witnesses testified that Alan needed permanency and that it would not be in his best interests to be returned to Buckley's care.

The juvenile court found that it was in the best interests of Alan that Natalie's and Buckley's parental rights be terminated. We agree. The parents' involvement with DHHS and the juvenile court date back to at least 2016, and the current juvenile court case was filed in August 2019. In this current court case alone, Alan had been out of the parents' home for 22 months at the time of the termination hearing. Alan had made significant progress, but his parents had not. Alan's therapist anticipated that once Natalie and Buckley took accountability and did everything they were asked to do, it would take "no less than 12 to 18 months" to get to the point of reunification. Alan deserves permanency. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. The State proved that Natalie and Buckley are unfit, meaning each parent has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to Alan's well-being. See *In re Interest of Leyton C. & Landyn C., supra*. We further find that there is clear and convincing evidence that it is in Alan's best interests to terminate Natalie's and Buckley's parental rights.

### 3. BUCKLEY'S OTHER ASSIGNED ERRORS

Buckley assigned, but did not specifically argue, that the juvenile court erred by not understanding that he was functionally illiterate and not ordering the State to provide him assistance in writing effective letters to Alan. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021).

Buckley also claims that he was not allowed to have telephone or video contact with Alan or intervention counseling with him. However, it was Buckley's own actions, or inactions, that prevented such contact and counseling as Buckley never completed phase 1 of the parental contact plan.

- 14 -

Finally, Buckley claims that the juvenile court erred by not furthering an "ICPC" investigation despite Buckley offering his brother in Kentucky as a potential placement for Alan. There was testimony from Hendrickson that DHHS did an ICPC request for Buckley's brother and sister-in-law. Buckley's brother and sister-in-law lived out of state and told DHHS that they had not seen Alan since he was "'itty bitty.'" Hendrickson stated that they initially expressed interest in having Alan, but "[t]hey want what's best for Alan and they believe, if his foster home is providing for his needs, that's what's best for him at this point." Hendrickson stated she completed the ICPC paperwork and submitted it prior to the November 2020 hearing, but that the judge mentioned that the ICPC would be premature because they were still working on reunification. Additionally, Hendrickson testified that moving Alan out of state would have been a detriment to his progress.

Buckley seems to be arguing that the failure to proceed with an ICPC for alternative placement somehow affected reunification efforts. He claims the State "totally ignored reports," including a "comprehensive psychological evaluation by Dr. Ted Delaet [sic]." Brief for cross-appellant at 32. However, we have reviewed Dr. DeLaet's evaluation and there is nothing that supports reunifying Alan with Buckley at this time. Dr. DeLaet "defers to the court on the best interest of the child decisions" and said "[t]he court's determination of the facts regarding domestic violence and [Buckley's] criminal and drug activities are key to determining parenting risk and reparation of the parent-child relationship." Dr. DeLaet also stated:

> Once the court's determination of the facts regarding the criminality and drug use and also the violence concerns and violence risk toward the son are established, then reconsideration of parent-child therapy would be needed. This writer strongly recommends initial contact beyond the letter writing activity with the son occur in therapeutic parent-child therapy sessions. . . . [Buckley] would need to have made some therapeutic progress himself to prepare for what he would talk about and some sensitivities and empathy for his son's situation beyond his current levels.

As we noted previously, it was Buckley's own actions, or inactions, that prevented therapeutic contact with Alan as Buckley never completed phase 1 of the parental contact plan.

We fail to see how placing Alan with out-of-state relatives would have facilitated Alan's reunification with Buckley. We also fail to see how the failure to proceed with an ICPC is relevant to determining whether Buckley's parental rights should be terminated.

## VI. CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Natalie's and Buckley's parental rights to Alan.

AFFIRMED.