IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

DIBBERN V. DIBBERN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KEYONA DIBBERN, NOW KNOWN AS KEYONA SANCHEZ, APPELLEE,

V.

DANIEL DIBBERN, APPELLANT.

Filed April 28, 2026.    No. A-25-468.

Appeal from the District Court for Lancaster County: DARLA S. IDEUS, Judge. Affirmed.

David P. Kyker, of Kyker Law Office, for appellant.

Jeanette Stull, of Atwood Law, P.C., L.L.O., for appellee.

MOORE, PIRTLE, and FREEMAN, Judges.

MOORE, Judge.

## INTRODUCTION

Keyona Dibbern, now known as Keyona Sanchez, filed a complaint in the district court for Lancaster County, seeking to modify the custody order previously entered in the dissolution proceedings involving her and Daniel Dibbern. Keyona sought a modification from joint legal and physical custody to sole legal and physical custody. The district court found that a material change in circumstances had occurred and that it was in the children's best interests to modify custody. Daniel appeals. For the following reasons, we affirm.

## STATEMENT OF FACTS

Keyona and Daniel were married in 2015. They have two children, Conrad, born in 2017, and Caden, born in 2020. On August 16, 2023, the district court entered a consent decree, dissolving the parties' marriage and approving and adopting the parties' written property settlement agreement and parenting plan, and ordering the parties to comply with the terms of

- 1 -

those documents, which were attached and incorporated into the decree. The court awarded the parties joint legal and physical custody of the children, and it ordered Keyona to pay child support of $192 for two children. The parenting plan provided for alternating weeks of parenting time. The parenting plan also provided, "Neither party shall be alcohol-impaired while in the presence of the minor children." And, it specified:

> The children's best interests require the utmost cooperation between parents. Neither party shall disparage or in any way denigrate the other parent in the children's presence. Neither parent will inquire of the other's personal affairs through the children. Each parent shall cooperate with the other in order to foster and promote a safe, secure, and loving environment for the children. Each parent shall support decisions made by the other and shall not in any way ridicule or criticize the other parent's good faith decisions with regard to the children.

On February 16, 2024, Keyona filed a complaint to modify. She alleged that a material change in circumstances had occurred since entry of the decree in that, despite participating in an inpatient alcohol rehabilitation program while the divorce proceedings were pending, Daniel had begun drinking again, including drinking to excess; that Daniel was cited for driving under the influence and negligent driving in November 2023; that he was drunk during his parenting time on a particular occasion in February 2024, requiring his family members to drive him and the children to and from a gathering; that Daniel had failed and refused to take the children to medical appointments during his parenting time; and that Daniel had failed and refused to get the children to school/daycare during his parenting time, resulting in tardies and absences for Conrad.

On April 1, 2024, the district court entered an order granting Keyona temporary sole legal and physical custody of the children and eliminating Daniel's overnight parenting time. The court also ordered Daniel to enroll in "Soberlink's 'Level 1-Parenting Time One' Plus program" and send Soberlink test results to Keyona 30 minutes prior to the start of each of his parenting time periods and 30 minutes prior to the end of each period. Finally, the court ordered both parties to complete a "Level 2 parenting class."

Daniel filed a motion to restore custody/parenting time, and on July 23, 2024, the district court entered an order restoring the original joint custody arrangement, subject to the revised parenting time schedule the parties followed informally after entry of the decree. Under the informal schedule as adopted in the court's order, Keyona had parenting time on Mondays and Tuesdays, Daniel had parenting time on Wednesdays and Thursdays, and the parties alternated weekends (Friday through Sunday). The court required Daniel to remain enrolled with Soberlink and conduct tests and send results to Keyona at 7 a.m., 11 a.m., 3 p.m., 7 p.m., and 11 p.m. during each day of his parenting time.

On January 20, 2025, Daniel filed an amended application for order to show cause, alleging that Keyona was in contempt of the decree and the April 2024 temporary order. Daniel specified the ways in which Keyona allegedly violated these orders, including refusing to consult with Daniel on the children's education, changing their school and daycare without discussion, refusing to communicate with Daniel about the children's enrollment in extracurricular activities, refusing to coparent with Daniel in various regards, and refusing to make the children available for phone

or other electronic communication when the children are in her care. The district court issued an order to show cause.

The modification and contempt proceedings were tried together before the district court on February 19 and 24, 2025. The court heard testimony from the parties and received exhibits, including copies of messages exchanged by the parties, school attendance records, Soberlink test results, and numerous other documents. With respect to the modification proceedings, there was evidence presented on Daniel's alcohol use, the children's education, the children's medical care, and the parties' communications, and we summarize the evidence presented on each of those issues.

The children were 4 and 7 years old at the time of trial. Conrad was in first grade and Caden was in preschool. Keyona testified that Daniel "has always struggled with alcohol addiction," but she agreed to joint custody at the time of the dissolution because Daniel had just returned from a "pretty intensive" inpatient rehabilitation program in Texas for "[m]ostly alcoholism." She testified that after the rehabilitation, Daniel was "[t]he most serious he's ever been" about getting sober, and she thought that he would prioritize parenting over his alcohol addiction. According to Keyona, since entry of the decree, Daniel "has proven to not be sober," and they have had "a lot of educational issues, medical issues, communication issues."

There was other evidence about Daniel's alcohol use. During December 2023, Keyona learned from Conrad that Daniel had a "DUI" in November. Eventually, Daniel told her that the DUI had "been handled" and was no longer an issue. Keyona testified that she was concerned about Daniel drinking after having completed the rehabilitation program and that he was willing to drive when he had been drinking. Keyona noted other things that led her to believe Daniel was drinking to excess, including certain communications from him and the children and Daniel bringing Conrad to school late during Daniel's parenting time. Keyona also testified that Daniel was supposed to have parenting time on New Year's Eve in 2024. Daniel never showed up for that parenting time, and the record shows that he did not complete a Soberlink test that day. On cross examination, Keyona was asked whether she recalled discussing with Daniel that he had to work on New Year's Eve and that she would keep the children until 7 p.m. on January 1. She did not recall such a discussion, but she acknowledged that Daniel picked the children up at 7 p.m. on January 1. The Soberlink test reports only show two noncompliant tests out of a total of 1,048 tests between June 2024 and January 2025. On May 15, 2024, a noncompliant test at 4:12 p.m. was followed by a positive retest at 4:28 p.m., and a compliant retest at 4:48 p.m. On May 19, a noncompliant test at 5:47 a.m. was followed by a "missed" scheduled retest at 6:02 a.m., and a compliant test at 6:25 a.m. The Soberlink reports do not reflect any testing on December 31, 2024. Daniel did not testify about the New Year's Eve issue.

Daniel acknowledged not letting Keyona know about his November 2023 DUI. He pled no contest to charges of DUI and negligent driving in August 2024. His driver's license was revoked for 6 months, but he was allowed to drive with an "interlock device." Daniel got his license back and his "interlock" removed the week of trial. He testified that since beginning the Soberlink testing, he has refrained from consuming alcohol when the children are in his care. Daniel attributed one of the noncompliant Soberlink tests to mouthwash use. With respect to the other noncompliant test, Daniel testified, "I was showering to go get the boys, and it was the same thing. I changed the straw and then the next one was fine." Daniel testified that following the parties'

divorce, he was "struggling with some depression and anxiety" but that he felt he no longer needed the accountability of the Soberlink testing. However, he expressed his willingness to continue the Soberlink testing if required by the district court.

As to educational issues, Keyona testified to her belief that Conrad had an excessive number of school absences during Daniel's parenting time. She testified that this was also an issue the previous year when Conrad was in kindergarten. Conrad had nine unexcused tardies and five unexcused absences during his first semester of first grade, all occurring during Daniel's parenting time. Some of the "absences" are attributable to the school marking a student absent for the day if they are tardy by more than 30 minutes. According to Daniel, it takes him 35 minutes to drive from his residence to the school. The previous year, Conrad attended a different school, located only a few minutes from Daniel's home. Daniel admitted that he was occasionally late getting Conrad to school during kindergarten. The attendance records from Conrad's kindergarten school year show 21 tardies or absences occurring during Daniel's parenting time (two excused tardies, 11 unexcused tardies, two excused absences, 2 days of illness, 3 half-day absences, and one unexcused absence). Daniel testified to steps he has taken to address the tardiness issue, including packing lunches and laying out clothes the night before. Keyona also testified that at the beginning of the 2024-2025 school year there had been issues with Conrad not turning in his homework at the end of the week during Daniel's parenting time. She addressed this issue by telling Conrad to prioritize homework completion during after school care, which had corrected the issue. The record shows that Conrad is doing well in school.

There was evidence about how the parties handled several of the children's healthcare needs. In August 2023, Daniel sent Keyona a picture of a rash on Caden's "diaper area." Although Daniel indicated he was going to "take him to the doctor to get him something prescribed," he did not do so. The next time Caden was in Keyona's care, she took him to the pediatrician, who prescribed both an oral and a topical antibiotic. The rash was a recurring issue.

Conrad was prescribed glasses in May 2023. Near the end of December, Keyona realized she had not seen Conrad's glasses "in a while," and she asked Daniel where they were. The parties exchanged text messages about the glasses, with Daniel indicating that he did not think Conrad needed glasses and that he did not tell Keyona this in May because he had "just gotten back from treatment and was trying to be nice." The rest of Daniel's reply included profanity and derogatory language. Although Keyona expressed concern about Conrad's ability to read or to see the television, Daniel declined to return the glasses to her or to Conrad. Keyona took Conrad back to the optometrist in June 2024 and purchased a new pair of glasses.

In January 2024, Conrad was scheduled for a dental appointment to fill four cavities. The appointment was during Daniel's parenting time, and he told Keyona he would take Conrad. The morning of the appointment, the dentist's office called Keyona "wondering if [they] were on [their] way." When Keyona contacted Daniel, he told her that Conrad "didn't need it" and to schedule appointments during her parenting time. Keyona had to reschedule the dentist appointment, and since then, she has scheduled the children's healthcare appointments during her parenting time.

There was considerable evidence about the parties' communications with one another while coparentings since entry of the decree. We have reviewed that evidence and do not recount the details here except to note that Daniel's written messages to Keyona in 2023 and the first half of 2024 were filled with vulgar, derogatory, and demeaning language. While Daniel's use of such

- 4 -

language in his messages had decreased by the time of trial, particularly after the parties began using the "Talking Parents . . . parenting app" in mid-2024, many messages were still aggressive, repetitive, and uncooperative. The parties have had difficulty in reaching a consensus on what daycare, preschool, school, and after care programs the children should attend; how payment of daycare and after-school care bills should be handled; and what activities the children should be involved in; as well as other issues such as the medical, dental, and vision care issues noted above.

There was also evidence of Daniel's in-person behavior on certain occasions, and we summarize some of those incidents. In January 2024, when Daniel was picking up the children, the parties had a conversation about "a missed basketball camp." At some point, Daniel "put his foot in the door so [Keyona] couldn't close it, kept yelling and wouldn't leave," called Keyona a derogatory name, and when Conrad started crying, Daniel "pushed him away to his car."

In May 2024, Keyona went to a playground near where Conrad was having football practice, so she could wait and then pick the children up after practice. Daniel had already brought Conrad to practice and Caden to the playground. Daniel followed Keyona and Caden around the playground where other children were playing, calling her names and making derogatory comments. Keyona took Caden and hid in her vehicle until the football practice ended.

Several incidents occurred during the children's wrestling practices. In October 2024, Daniel followed Keyona "up the stairs" at a wrestling practice and was "just harassing [her]." When she attempted to sit with other waiting parents, Daniel followed and sat next to her. Conrad was sitting with Keyona because his wrestling practice was after Caden's. Daniel made comments about Keyona being "a bad mom," and he made "loud" comments about Keyona's coparenting and other topics. A similar incident happened at the next wrestling practice. According to Keyona, at some point, she and Conrad hid in a bathroom because Conrad did not want his teammates to see him crying. At another point, Conrad was sitting next to Keyona doing his homework. Daniel became upset and dragged Conrad away by his arm to go sit by Daniel. Keyona left the practice to get away from Daniel, after which Daniel sent her text messages accusing her of "ditching" Caden, followed by additional rude and derogatory commentary. Since then, Keyona has tried to solve the issue of Daniel following her around at the children's practices and games by either leaving, sitting with the public, or bringing her boyfriend.

Keyona also testified about an incident that occurred the weekend prior to trial. Keyona had planned a surprise trip to California for the children over the long holiday weekend. Keyona waited to tell Daniel about the trip until the morning of the day they were leaving because she did not want him to ruin the surprise, but later that day when Keyona told the children about the trip, they already knew about it.

Keyona testified that because of the parties' communication issues and the issues with respect to alcohol, healthcare, and education, she was no longer able to effectively coparent with Daniel. She indicated that those issues were all "significantly different" than at the time of the original decree and reflected circumstances she did not anticipate at the time the decree was entered. She asked the court to allow her to "make sole decisions" regarding the children's education, religion, and medical issues and to adopt her proposed changes to the parenting plan.

According to Daniel, at the end of 2023, he "was in a very, very dark place," "said the worst things of [his] life," was "in the lowest place of [his] life," and "had a lot of work to do." Daniel acknowledged that certain text messages he sent Keyona were "offensive and out of line"

and testified that he "feel[s] terrible about them." Since then, he has obtained counseling, has completed a "surviving divorce group," and taken other steps to address his physical and mental wellbeing. Daniel testified to his belief that the children would not benefit if his time with them was reduced. He asked the district court to deny Keyona's request to change custody and reduce his parenting time, but he asked the court to consider other proposed changes to the parties' parenting plan, in the event the court found a material change in circumstances. Daniel believes that the parties could continue to make decisions in the children's best interests with the changes contained in his proposed parenting plan.

On May 29, 2025, the district court entered an order ruling on Keyona's modification complaint and Daniel's show cause application. The court first determined that there was a material change in circumstances that warranted a modification of custody. The court then determined that modification of custody was in the children's best interests. The court awarded Keyona sole legal and sole physical custody of the children, subject to the terms of the attached parenting plan, and it ordered Daniel to pay Keyona $910 per month in child support for two children. The parenting plan specified that Daniel was to have parenting time "every other weekend" from 3 p.m. on Thursday until 8:15 a.m. the following Tuesday. It also detailed a transition plan, specified how the parties were to handle adjustments to the schedule on weekends when Keyona had National Guard duty, and provided for holiday and summer parenting time. We set forth further details of the court's findings with respect to the custody modification in our analysis below. Finally, the court considered each of Daniel's allegations of contempt and determined that Daniel did not prove that Keyona willfully violated the decree and the August 2024 temporary order. Accordingly, it vacated and dismissed the order to show cause.

Daniel filed a motion for new trial and motion to alter or amend the May 2025 order, which was overruled by the district court on June 18, 2025. Daniel subsequently perfected his appeal to this court.

ASSIGNMENTS OF ERROR

Daniel asserts, restated, that the district court abused its discretion in (1) finding a material change in circumstances had occurred that warranted and justified a modification of legal and physical custody and (2) finding that modification of custody was in the children's best interests.

STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion. *Sulzle v. Sulzle*, 318 Neb. 194, 14 N.W.3d 532 (2024). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024).

ANALYSIS

Daniel asserts that the district court abused its discretion in finding that a material change in circumstances had occurred warranting a modification of the joint legal and physical custody

awarded to the parties in the decree and finding that modification of custody to award sole legal and physical custody to Keyona was in the children's best interests.

Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). Modifying a custody or parenting time order requires two steps of proof. *Mann v. Mann, supra*. First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id.* Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id.*

*Material Change in Circumstances.*

Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. *Id.* Proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances. *Lindblad v. Lindblad, supra*.

In its May 2025 order, the district court found that Keyona met her burden to show that a material change in circumstances had occurred since entry of the decree, in that Daniel "ha[d] not consistently maintained sobriety, he ha[d] failed to adequately meet the children's educational and medical needs, and he ha[d] engaged in an ongoing pattern of harassment and abuse toward [Keyona]." The court stated:

> The basic foundation for joint custody and a functioning coparenting relationship is the ability of both parents to put aside personal differences so that they may communicate and coparent their children in a healthy productive manner. [Daniel] has repeatedly shown he is unable to put aside his personal negative emotions toward [Keyona]. While [Keyona] acknowledged [Daniel] used vulgar language toward her before the Decree, she testified that his use of inappropriate, vulgar language at the children's activities is new. Further, [Daniel] denied calling [Keyona] names at all prior to the divorce. Certainly, an escalation in parental instability or an increase in negative parental behavior that affects the best interests of the children can support a finding of a material change in circumstances. . . . This is true even if, as [Daniel] argues here, there is some evidence of similar bad behavior in the past.

(Citations omitted.)

The district court also rejected Daniel's argument that his harassing and abusive communications could not be a basis for a material change because the issue of his communications was not specifically pled. The court noted Neb. Ct. R. Pldg. § 6-1115(b)(2) (rev. 2025), concerning issues not raised in the pleadings but tried by consent of the parties. The court determined that the parties' "poor communications" and Daniel's "harassment and abuse toward [Keyona]" was tried by consent of the parties.

On appeal, Daniel argues that the evidence at trial addressed issues that existed prior to entry of the decree or were transitory in nature and did not constitute a material change in circumstances. In support of this argument, Daniel cites *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021), which provides that before custody is modified, it should be apparent that any material change in circumstances alleged will be permanent or continuous, not merely transitory or temporary. Daniel also cites *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020), which provides that as a general rule, when determining whether the custody of a minor child should be changed, the evidence of the custodial parent's behavior during the year or so before the hearing on the complaint to modify is considered most significant.

With respect to the specific bases for a material change in circumstances at issue, Daniel first notes that the parenting plan attached to the August 2023 decree only required the parties not to be alcohol-impaired while in children's presence. He acknowledges his November 2023 DUI, but he argues that this alcohol use did not occur in the children's presence and was a transitory event, as evidenced by his Soberlink test results. He also argues that Keyona's concerns about his alcohol use pre-date the decree. Next, Daniel argues that there was no evidence Conrad had been tardy from school for over a month prior to trial, that any issue with respect to homework completion had been corrected, and that the evidence showed Conrad was doing well in school. Daniel makes similar arguments with respect to the evidence about the children's medical care, concluding by stating that there "is simply no 'needle-moving' event which occurred since entry of the [d]ecree that establishes that [Daniel], a loving father, did not seek appropriate medical care for his boys." Brief for appellant at 20. Finally, with respect to the parties' communications, he points to Keyona's testimony that he had a history of sending her vulgar and inappropriate messages and that he sent numerous such messages prior to entry of the decree. With respect to post-decree communication, Daniel argues that by the time of trial, "his use of expletive filled, and demeaning language essentially disappeared," which he attributes to the counseling he sought "to help him through the depression and anger that the loss of his marriage brought him" and his completion of "a surviving divorce group which helped him heal from the pain of family separation." Brief for appellant at 21.

The evidence was in conflict, and we consider and give weight to the fact that the district court heard and observed the witnesses and accepted one version of the facts rather than the other. See *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024). To the extent certain issues existed before entry of the decree, the evidence supports the district court's conclusion that the evidence showed an increase in negative parental behavior affecting the children's best interests and supporting a material change in circumstances. See e.g., *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021) (increase or escalation in parental instability or parental behavior that affects best interests of child can support judicial finding that there has been material change in circumstances, even if there is some evidence of similar behavior in past); *Jones v. Jones, supra* (increase in custodial mother's periods of unemployment and housing instability combined to present material change in circumstances affecting child's best interests); *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019) (post-decree escalation in father's angry, abusive, and threatening behavior toward children supported finding of material change in circumstances warranting modification in parenting time). The evidence shows an escalation of Daniel's negative and harassing behavior toward Keyona since entry of the decree, some of which occurred in front of the children and

others which distressed Conrad. Although Daniel had made some changes to the language used in his communications with Keyona by the time of trial, the record shows that his communications continued to reflect his negative attitude toward her and clearly inhibited the parties' ability to coparent effectively. The district court did not err in finding a material change in circumstances.

*Best Interests.*

Under the Parenting Act, the requirements for a child's best interests include "[a] parenting arrangement and parenting plan or other court-ordered arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children." Neb. Rev. Stat. § 43-2923(1) (Reissue 2016). Additionally, § 43-2923(6) sets forth a non-exhaustive list of factors to be considered in determining the best interests of a child in regard to custody, including:

> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Rodas v. Franco*, 30 Neb. App. 910, 974 N.W.2d 856 (2022).

With respect to best interests, the district court found:

> There is no doubt that both of these parents love their children and want to be involved and active parents. But there is also no doubt that the parties do not get along. The record is replete with examples of [Daniel's] use of aggressive, bullying, vulgar language. . . . When [Daniel] has attempted to engage in in-person conversations with [Keyona], he does so in public forums and by following her around in a harassing manner, loudly discussing the parties' issues in the presence of strangers and calling her names in front of the children reducing them to tears. Coparenting is difficult to impossible when [Daniel] says [certain aggressive and demeaning things].
>
> [Daniel's] ongoing dislike and distrust for [Keyona] was likewise evident in his demeanor and testimony at trial.

The evidence is clear that neither parent believes that joint custody is working for their family. [Keyona] filed this Complaint to Modify requesting sole legal and physical custody. [Daniel] filed a Motion for Order to Show Cause claiming that [Keyona] had violated the Court's orders. The allegations in the Application for Order to Show Cause and evidence refuting those allegations is further support of the court's finding that joint custody is not in the children's best interest[s]. There is simply no reason to believe that the parties' communication and ability to amicably resolve matters will improve in the future. When joint custody is not in the children's best interest, one parent must be awarded sole custody to be able to make timely decisions regarding the children without the decision-making devolving into accusations about the other parent. In addition, the children need the stability and structure of a sole custodial parent who will make sure they get to school on time, do their school work, get to medical appointments, and follow medical providers' recommendations. In this situation, that parent is [Keyona]. The Court finds that it is in the children's best interest for [Keyona] to have sole legal and physical custody of the children subject to the terms and conditions of the Parenting Plan attached hereto and incorporated herein by reference. The court finds the terms of said Plan are in the minor children's best interest. It is approved, and the parties are ordered to abide by it in all manner and respect.

In support of this assignment of error, Daniel argues that the district court placed too much weight on Daniel's poor written communications and his failings in getting the children to school on time and did not adequately weigh whether a change in custody was in the children's best interests. Again, the evidence at trial was conflicting and the court accepted Keyona's version of the facts over Daniel's. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024). See, also, *Conley v. Conley*, 33 Neb. App. 98, 11 N.W.3d 671 (2024) (witness credibility and weight to be given to testimony is within province of trial court). Upon our de novo review, we find no abuse of discretion in the court's determination that it was in the children's best interests to modify the decree to award sole legal and physical custody to Keyona.

CONCLUSION

Upon our de novo review, we conclude that the district court did not abuse its discretion in finding a material change in circumstances affecting the best interests of the parties' children and justifying a custody modification. Accordingly, we affirm.

AFFIRMED.